1                IN THE UNITED STATES DISTRICT COURT

2                 FOR THE NORTHERN DISTRICT OF OHIO

3                       EASTERN DIVISION

4

5    Nicole Poston,

6                     Plaintiff;

7        vs.                        Case No. 5:16-cv-03013-SL

8    Massillon City Schools,

9                     Defendant.

10                        - - - -

11        Deposition of NICOLE M. POSTON, the Plaintiff herein,

12   taken by the Defendant upon adverse party examination

13   before Mary Lou Mellinger, a Notary Public within and

14   for the State of Ohio, at the Massillon City Schools

15   Administration Building, 930 17th Street NE, Massillon,

16   Ohio, commencing at 10:10 A.M., Thursday, October 26, 2017,

17   pursuant to notice and stipulations of counsel.

18

19                              - - - -

20

21

22

23

24

25   Job Number: 428549

NICOLE M. POSTON - 10/26/2017

Page 2

```
 1   APPEARANCES:

 2   Emily White, Esq.
     The Dann Law Firm
 3   P.O. Box 6031040
     Cleveland, Ohio 44103
 4   216.373.0539
     notices@dannlaw.com
 5
            On behalf of the Plaintiff;
 6

 7

 8   Sherrie C. Massey, Esq.
     Smith, Peters & Kalail Co., L.P.A.
 9   6480 Rockside Woods Boulevard, South, Suite 300
     Cleveland, Ohio 44131
10   216.503.5055
     smassey@ohioedlaw.com
11
            On behalf of the Defendant.
12

13                      - - - -

14    ALSO PRESENT:

15    Mark Fortner, Assistant Principal

16                      - - - -

17                EXAMINATION INDEX

18   By Ms. Massey ...................... page 4

19   By Ms. White ...................... page 109

20   By Ms. Massey ...................... page 121

21

22                      - - - -

23

24

25
```

NICOLE M. POSTON - 10/26/2017

```
 1                       EXHIBIT INDEX

 2    Defendant's
      Exhibit                                Marked
 3

 4    1   Internal Job Posting               13
          Small Group Teacher
 5

 6    2   Internal Job Posting               24
          Intervention Specialist
 7

 8    3   February 3, 2014 letter            70

 9
      4   October 23, 2014 letter            77
10

11    5   October 20, 2015 letter            83

12
      6   December 14, 2015 memorandum       89
13

14    7   Accommodation Plan                 93

15

16    Plaintiff's
      Exhibit                                Marked
17

18    1   September 2, 2015 letter           113

19

20    2   TBT Training slides                117

21

22    3   PBIS Handbook 2015-2016            119

23

24                       - - - -

25
```

NICOLE M. POSTON - 10/26/2017

```
 1                      NICOLE M. POSTON, of lawful age, the
 2                      Plaintiff herein, called by the Defendant
 3                      for the purpose of adverse party examination,
 4                      as provided by the Rules of Civil Procedure
 5                      for the District Courts of the United States,
 6                      being by me first duly sworn, as hereinafter
 7                      certified, deposed and said as follows:
 8                              - - - -
 9                      EXAMINATION OF
10                      NICOLE M. POSTON
11      BY MS. MASSEY:
12   Q  Good morning, Ms. Poston.  As you know, my name is
13      Sherrie Massey.  Today I'm going to be taking your
14      deposition and asking you some questions.
15          For the record, please state your full name and
16      spell your last name.
17   A  Nicole Marie Poston, P-o-s-t-o-n.
18   Q  Okay.  I'm going to go over a few rules with you for
19      purposes of today's deposition.
20   A  Okay.
21   Q  As you see, there's a court reporter here.  She's
22      going to take down everything that we say during the
23      deposition unless we decide to go off the record.  So
24      you need to say words.  It's very hard for her to
25      transcribe you nodding or saying "um-um" or "uh-uh,"
```

NICOLE M. POSTON - 10/26/2017

Page 5

```
 1   it ends up coming out the same.  So if I ask you a
 2   question, say yes or no.
 3       I'll be asking a series of questions.  It's only
 4   fair that you understand what I ask you.  If I ask
 5   you something and you don't understand what I'm
 6   asking you, just let me know, and I'll rephrase the
 7   question.  Otherwise, I will take it that you
 8   understood the question and that's what will appear
 9   in the record.
10       If you need to take a break at any time, just
11   let me know.  This is not intended to be a marathon
12   or to test your endurance.  I will just say if there
13   is a question pending, please answer the question
14   before we take a break.
15       Now, it's difficult for the court reporter to
16   take down everything if we're talking at the same
17   time.  So I would just ask that if I ask you a
18   question, you allow me to finish asking the question,
19   and once you answer, I'll allow you to finish
20   answering your question, so that she doesn't have to
21   transcribe both of us talking at the same time.
22       Now, after we complete the deposition, the court
23   reporter will prepare a written transcript.  Your
24   attorney will instruct you on whether you will read
25   it and you will have an opportunity to correct any
```

```
 1        errors.  If you do change the substance of some of
 2        your answers, I will have the opportunity to bring
 3        you back if I have additional questions.
 4             Now, your attorney from time to time throughout
 5        the deposition may object.  We're trying to preserve
 6        the record for purposes of if something -- you know,
 7        we need to bring up something to the judge at some
 8        point.  So the objections are for the record and will
 9        be ruled upon later.  If your attorney objects, you
10        should nevertheless answer unless she specifically
11        instructs you not to do so.
12             Do you have any questions for me before we
13        begin?
14   A    No.
15   Q    Okay.  Now, if you could tell me where you currently
16        reside?
17   A    In Canton.
18   Q    Okay.  And how long have you resided in Canton?
19   A    Thirty years, approximately.
20   Q    Okay.
21   A    Thirty years.
22   Q    Now, have you been deposed before?
23   A    No.
24   Q    Okay.  Have you had to testify at a hearing or a
25        trial before?
```

NICOLE M. POSTON - 10/26/2017

Page 7

```
 1   A    No.

 2   Q    Okay.  And did you speak to anyone regarding this

 3        deposition, other than your attorney?  I don't want

 4        to know what you talked to your attorney about.  Did

 5        you speak with anyone else in preparation for your

 6        deposition?

 7   A    No.

 8   Q    Did you review any documents in preparation for your

 9        deposition?

10   A    No.

11   Q    Okay.  Now, I'm just going to go over a few things in

12        terms of your background.  Where did you attend high

13        school?

14   A    Jackson High School.

15   Q    Okay.  And where did you attend college, starting

16        with where you went for undergraduate school?

17   A    My undergraduate was done at Kent State University.

18   Q    Okay.  And what degree did you obtain from Kent

19        State?

20   A    Mild-moderate intervention specialist.

21   Q    Okay.

22   A    And then my Master's Degree was through the

23        University of Michigan.

24   Q    Okay.  What did you get your Master's Degree in?

25   A    It was a Master's in education with special education
```

NICOLE M. POSTON - 10/26/2017

Page 8

```
 1          being the emphasis.
 2   Q      And when did you obtain your degree from Kent State?
 3   A      December of 2001.
 4   Q      And when did you obtain your degree from the
 5          University of Michigan?
 6   A      I'm not sure.
 7   Q      Okay.  Other than Kent State University and the
 8          University of Michigan, have you taken classes at any
 9          other colleges or universities?
10   A      Yes.
11   Q      Okay.  And where did you attend school?
12   A      I don't remember the name of it.  It was through a --
13          there's a party that I take the classes through and
14          then they go through a university, I think it was --
15          it was a small university in Michigan, but I don't
16          remember the name of it.
17   Q      And what type of coursework did you take?
18   A      It's just continuing professional development that we
19          have to get so many credit hours for to renew our
20          license, teaching license.  Advancement Courses is
21          the entity that I take it through, and then they
22          partner with universities to just give you the
23          credits for it.
24   Q      When did you first obtain your teaching certificate
25          or license?
```

NICOLE M. POSTON - 10/26/2017

Page 9

| | | |
|---|---|---|
| 1 | A | That would have been once I graduated. |
| 2 | Q | **Okay.  So in 2001, after you graduated?** |
| 3 | A | Yeah.  Probably it might have been technically 2002, |
| 4 | | because I graduated in December of 2001. |
| 5 | Q | **Okay.  And in what area did you obtain your licensure** |
| 6 | | **or certification?** |
| 7 | A | Intervention specialist. |
| 8 | Q | **Have you possessed any other teaching certifications** |
| 9 | | **or licenses from ODE, other than intervention** |
| 10 | | **specialist?** |
| 11 | A | No. |
| 12 | Q | **And did you work for any school districts prior to** |
| 13 | | **coming to Massillon?** |
| 14 | A | Can I ask for a clarification? |
| 15 | Q | **Yes.** |
| 16 | A | Are you speaking as a teacher, or just as an |
| 17 | | employee? |
| 18 | Q | **Well, let's start off first just as an employee, did** |
| 19 | | **you work for any school districts?** |
| 20 | A | Yes. |
| 21 | Q | **Where did you work?** |
| 22 | A | Green Local Schools. |
| 23 | Q | **And what position did you hold in Green Local?** |
| 24 | A | Teacher's aide. |
| 25 | Q | **And how long did you serve in that position?** |

NICOLE M. POSTON - 10/26/2017

Page 10

1    A    I did two summers, extended school year, their

2         extended school year services.  So it was the summer

3         of, I believe the summer of 2000 and 2001, I believe.

4         It was prior to me completing my undergrad.

5    Q    **Okay.  Now, did you do something separate in terms of**

6         **student teaching with the school district while you**

7         **were getting your undergraduate degree?**

8    A    I did my student teaching in the fall of 2001, and it

9         was with North Canton City Schools.

10   Q    **Now, when did you first start working for Massillon?**

11   A    August of 2002.

12   Q    **And what position did you first obtain when you**

13        **started working with Massillon?**

14   A    Small group teacher.

15   Q    **Have you had any breaks in employment, any long**

16        **leaves of absence or anything like that since you've**

17        **been employed with Massillon?**

18   A    No.

19   Q    **Have you ever had any job, outside job concurrent**

20        **with your employment here at Massillon?**

21   A    No.

22   Q    **Any volunteer jobs or anything like that?**

23   A    Yes, I did volunteer.

24   Q    **And what type of volunteer work do you do?**

25   A    Currently?

NICOLE M. POSTON - 10/26/2017

Page 11

| | | |
|---|---|---|
| 1 | Q | Yes.  Do you currently do any volunteer work? |
| 2 | A | I do volunteer work through SNAP. |
| 3 | Q | And what is SNAP? |
| 4 | A | It's a -- they do low cost spay and neuter for cats |
| 5 | | and dogs. |
| 6 | Q | And how long have you volunteered with them, with |
| 7 | | SNAP? |
| 8 | A | I'm not sure. |
| 9 | Q | Any other current volunteer work other than SNAP? |
| 10 | A | I belong to a local chapter of the American Council |
| 11 | | for the Blind. |
| 12 | Q | And what type of volunteer work do you do with the |
| 13 | | local chapter of the American Council for the Blind? |
| 14 | A | I'm the treasurer. |
| 15 | Q | And how long have you served in that capacity? |
| 16 | A | Eight years, maybe. |
| 17 | Q | You said you were initially hired as a small group |
| 18 | | instructor.  When you first started at Massillon, |
| 19 | | which building -- were you assigned to a specific |
| 20 | | building as a small group instructor? |
| 21 | A | Yes, Bowers Elementary. |
| 22 | Q | And how long were you assigned to Bowers Elementary? |
| 23 | A | Two years. |
| 24 | Q | And after those two years, which building were you |
| 25 | | assigned to? |

NICOLE M. POSTON - 10/26/2017

```
 1   A    York Learning Center.

 2   Q    And how long were you assigned to York Learning

 3        Center?

 4   A    One year.

 5   Q    And after York where were you assigned?

 6   A    Massillon Middle School.

 7   Q    And how long were you assigned to Massillon Middle

 8        School as a small group instructor?

 9   A    This will be my 13th year in the building.

10   Q    Okay.  Now, when you left Bowers Elementary and went

11        to York Learning Center, did you ask -- were you

12        promoted, or did you ask to be reassigned to York

13        Learning Center?

14   A    I was moved by administration.

15   Q    Did you continue to perform the same type of duties

16        at York Learning Center that you were performing at

17        Bowers Elementary?

18   A    Yes.

19   Q    And what about when you moved from York Learning

20        Center to Massillon Middle School, did you apply to

21        move to that building?

22   A    No, but York Learning Center was closed at the end of

23        that school year, so I had to be moved somewhere

24        else.

25   Q    Now, what were your duties or job responsibilities as
```

NICOLE M. POSTON - 10/26/2017

```
 1          a small group instructor?

 2   A      Providing services to students with special needs,

 3          writing IEPs, writing behavior plans, collaborating

 4          with teachers.

 5   Q      Now, do you deal with a specific population of

 6          students with special needs, do they have similar

 7          special needs, or do you just provide services to

 8          students across the board?

 9   A      The disability categories vary.

10   Q      Okay.  But consistent with your certification they're

11          mild to moderate?

12   A      Correct.

13   Q      I'm going to hand you what's going to be marked as --

14          I'm going to do 1, Exhibit 1.

15                          - - - -

16              (Thereupon, Defendant's Exhibit 1 was

17               marked for identification.)

18                          - - - -

19   Q      Nicole, I'm going to hand you the official document,

20          but I'm also going to hand you one that's been

21          enlarged --

22   A      Okay.

23   Q      -- for us to go over.  What's been marked as Exhibit

24          1 is a posting for the position of small group

25          teacher from December of 2014, but I guess I would
```

NICOLE M. POSTON - 10/26/2017

1    like for you to take a look at the job description

2    and take your time and just verify whether what's

3    listed in the job description accurately covers the

4    duties that you performed as a small group

5    instructor.  And you can stop once you get to Other

6    Duties and Responsibilities.

7        Have you had an opportunity to review it and I

8    can ask you some questions?

9  A  I have.

10  Q  Okay.  Does the information in this job description

11    accurately reflect what you did as a small group

12    instructor?

13  A  Yes, with the exception of provide student schedules

14    for substitutes.

15  Q  And that's on which page?

16  A  Well, it might be different in yours than in mine.

17  Q  Okay.  I have the large one, so --

18  A  Oh, you do?

19  Q  Yeah.

20  A  So it's the third page.

21  Q  Third page.  So you didn't provide student schedules

22    for substitutes?

23  A  Correct, the district did not provide substitutes for

24    small group teachers.

25  Q  They did not, okay.  Now, explain to me what you

NICOLE M. POSTON - 10/26/2017

1    **would do during a typical day as a small group**

2    **instructor, from the time you got to work until the**

3    **end of your day.**

4  A   Are you speaking of when I started teaching, or are

5      you speaking of now?

6  Q   **Well, you're an intervention specialist now, correct?**

7  A   Correct.

8  Q   **Okay.**

9  A   But last year I was a small group teacher.  So like

10     are we talking present day or back?

11 Q   **We can talk about last year, during the 2016-2017**

12     **school year, what was a typical day like for you?**

13 A   I provided -- I went into the inclusion classroom in

14     language arts and math and provided services to

15     students and instruction to students within the

16     general education classroom.

17        There was a period during the day called

18     enrichment time in which I provided services in a

19     pull-out small group setting within my classroom to

20     address students' needs in various subject areas and

21     to address IEP goals.

22        There was also a period of the day in which I

23     met with a team of teachers, it was called teacher

24     based teams, it was a period of time in which we met

25     and discussed instruction.

NICOLE M. POSTON - 10/26/2017

Page 16

1  Q    Did you have teacher based time each day?

2  A    Yes.

3  Q    And how long did that typically last each day?

4  A    It was 40 minutes.

5  Q    And how many other teachers would be involved in the

6       TBT meetings, or small group instructors?

7  A    It varied.

8  Q    It varied?

9  A    It varied from day-to-day.

10  Q   And did it vary from day-to-day just given individual

11      schedules, do you know?

12  A   In some cases.  It depended.  We had different days

13      in which we met with our subject level teachers, and

14      then there were days where we met as a larger grade

15      level team.

16  Q   Now, with respect to subject level, since you've been

17      employed in the district, have you always provided

18      services to students in language arts and math as a

19      small group instructor?

20  A   Yes.

21  Q   And since you went from the York Learning Center to

22      Massillon Middle School, what grade level students

23      did you provide services to?

24  A   In which building?

25  Q   At Massillon Middle School.

NICOLE M. POSTON - 10/26/2017

Page 17

```
 1   A    The year that I started in Massillon Middle School?

 2   Q    Yes.

 3   A    Fifth grade.

 4   Q    And over the course of the 13 years that you've

 5        been -- that you were a small group instructor at

 6        Massillon Middle School, did you provide services to

 7        students other than in the fifth grade?

 8   A    Yes.

 9   Q    What grades did you provide services to students?

10   A    Fourth grade and sixth grade, in addition to fifth

11        grade.

12   Q    Now, during a given school year, did you ever provide

13        services to students in different grade levels, so

14        did you ever provide services to students in both --

15        services to students in both fourth and fifth grade?

16   A    Yes.

17   Q    How many years would you say that you provided

18        services to students in two grade levels?

19   A    Maybe five or six.

20   Q    Have you ever provided services to students in all

21        three grade levels while you were at Massillon Middle

22        School?

23   A    Yes.

24   Q    And how many years would you say you did that?

25   A    Once.
```

NICOLE M. POSTON - 10/26/2017

1  Q   During the 2016-2017 school year, in what grade did

2      you provide services to students?

3  A   Fifth and sixth.

4  Q   Fifth and sixth.  I'm just going to go back just a

5      few years.  Do you have a specific caseload of

6      students who you're responsible for providing

7      services to, did you as a small group instructor?

8  A   Yes.

9  Q   Okay.  In the 2013-2014 school year, do you recall

10     how many students were assigned to your caseload?

11 A   I don't recall.

12 Q   What about the 2014-15 school year, do you remember

13     how many students were assigned to your caseload?

14 A   No, I don't remember.

15 Q   '15-16 do you remember?

16 A   No.

17 Q   What about '16-17, do you remember how many students

18     were assigned to your caseload?

19 A   I don't remember the exact number, I'd be guessing.

20 Q   And I don't want you to guess.  Would you say for the

21     2016-2017 you had more than 10 students assigned to

22     your caseload?

23 A   Yes.

24 Q   Did you have over 20 students assigned to your

25     caseload?

NICOLE M. POSTON - 10/26/2017

Page 19

1  A   No.

2  Q   So it was more than 10, but under 20?

3  A   Yes.

4  Q   And the students who were assigned to your caseload,

5      were those the students who you would provide

6      language arts and math services to in the inclusion

7      classroom?

8  A   Correct.

9  Q   Okay.  And did you also provide the students who were

10     on your caseload with services in a small group

11     setting in enrichment time?

12 A   Correct.

13 Q   Now, outside of the students assigned to your

14     caseload, for example, during the 2016-17 school

15     year, did you provide services to any other students?

16 A   '16-17?

17 Q   Yes.

18 A   Yes.

19 Q   Okay.  And what type of services did you provide to

20     students outside of your assigned caseload?

21 A   I provided services in a small group pull-out

22     setting.

23 Q   And how many students, other than the ones on your

24     caseload, would you provide services to in a small

25     group pull-out setting '16-17 school year?

NICOLE M. POSTON - 10/26/2017

Page 20

```
 1   A    It varied, but it was between like one and three.
 2   Q    And just help me understand, you have students
 3        assigned to your caseload, under what circumstances
 4        would you provide services -- why would you be
 5        providing services to students who were not assigned
 6        to your caseload?
 7   A    Administration had asked that I provide help to
 8        provide services to fifth graders in supporting
 9        the -- another small group teacher who was providing
10        services in fifth grade.
11   Q    And did you provide that assistance during the entire
12        2016-2017 school year?
13   A    Yes.
14   Q    And with respect to the students who were assigned to
15        your caseload, in addition to providing services to
16        them, were you responsible for writing each of those
17        students' IEPs?
18   A    The students on my caseload?
19   Q    Yes.
20   A    Yes, I was responsible for writing their IEPs.
21   Q    Were you responsible for writing their behavior plans
22        as well?
23   A    Yes.
24   Q    And you collaborated with other teachers concerning
25        the students on your caseload?
```

NICOLE M. POSTON - 10/26/2017

1   A   Yes.

2   Q   **And if you were responsible for providing language**

3       **arts and math services to those students, was there**

4       **another small group instructor who would be**

5       **responsible for providing other services to the**

6       **students on your caseload?**

7   A   I had assistance from another small group teacher

8       during the pull-out portion.

9   Q   **Did you have assistance on a frequent basis from that**

10      **individual?**

11  A   Several days a week.

12  Q   **Now, when you were assigned to Massillon Middle**

13      **School, and we can talk about between the 2013-14**

14      **school year through the 2016-17 school year, to whom**

15      **did you report, the title?  Did you report to the**

16      **principal of the building?**

17  A   Yes.

18  Q   **And who's the current principal of Massillon Middle**

19      **School?**

20  A   Can I ask a clarification?

21  Q   **Yes.  I'm sorry --**

22  A   It's two separate buildings now, it's Massillon

23      Intermediate and Massillon Junior High, so --

24  Q   **So just for clarification, when you discussed the**

25      **fact that you provided services to students in grades**

NICOLE M. POSTON - 10/26/2017

```
 1          four, five and six over the past 13 years, you were

 2          providing services to students at the intermediate

 3          school, correct?

 4    A     Yes, once it -- yes.

 5    Q     Finish your thought, "once it" what?

 6    A     Once it went from Massillon Middle School, it went

 7          from one building to two separate buildings.

 8    Q     Okay.  And when did it switch from Massillon Middle

 9          School, being one building, to two separate

10          buildings, being Massillon Intermediate and Massillon

11          Middle?

12    A     I don't remember the year.

13    Q     Okay.  When it went from one building to two

14          buildings, were you just responsible for reporting to

15          the Massillon Intermediate principal at some point?

16    A     Yes.

17    Q     And for the '16-17 school year, who was the Massillon

18          Intermediate principal?

19    A     Jarred Zapolnik.

20    Q     And can you recall how many years you've reported

21          directly to Jarred Zapolnik?

22    A     Including this year?

23    Q     Yes.

24    A     Four.

25    Q     So four years including this school year?
```

NICOLE M. POSTON - 10/26/2017

```
 1   A    Correct.
 2   Q    Did Mr. Zapolnik evaluate you in the last three
 3        years?
 4   A    Yes.
 5   Q    And what type of evaluation did you receive from
 6        Mr. Zapolnik, if you can remember an overall rating?
 7   A    Accomplished.
 8   Q    Were you evaluated each of those three years, that
 9        you recall?
10   A    Not a full evaluation.  They do a short evaluation on
11        what they call the off years.
12   Q    Now, while you were employed as a small group
13        instructor, did you hold any supplemental contracts?
14   A    No.
15   Q    Have you ever held a supplemental contract in
16        addition to your teaching contract since you've been
17        with Massillon?
18   A    No.
19   Q    Have you been involved in any other school related
20        activities during your employment as a small group
21        instructor?
22   A    Yes.
23   Q    And what type of activities have you been involved
24        in?
25   A    I did student council.
```

NICOLE M. POSTON - 10/26/2017

Page 24

```
 1   Q   Were you the advisor for student council?

 2   A   I was one of the advisors for student council.

 3   Q   And which grades?

 4   A   It was at the elementary, so I believe we would be

 5       involved, maybe third to fifth.

 6   Q   And when did you do that?

 7   A   My first two years in the district at Bowers.

 8   Q   Any other activities other than student council?

 9   A   I did after school tutoring.

10   Q   How long did you do after school tutoring?

11   A   I believe I did it two years.

12   Q   And was there a specific grade level that you

13       provided tutoring services for?

14   A   I don't remember what grade level it was.

15   Q   Now, you're currently employed as an intervention

16       specialist, correct?

17   A   Yes.

18   Q   And you've been in that position for how long?

19   A   This year.

20   Q   And just generally, what are your duties and

21       responsibilities as an intervention specialist?  I

22       have a job description.

23               MS. MASSEY:  Mark this as 2.

24                     - - - -

25               (Thereupon, Defendant's Exhibit 2 was
```

NICOLE M. POSTON - 10/26/2017

```
 1                    marked for identification.)

 2                         - - - -

 3    Q    Here's an enlarged one.

 4    A    Thank you.

 5    Q    If you could take a moment to look at what's been

 6         marked as Exhibit 2, it does say Massillon City

 7         Schools Internal Job Posting, but below it has the

 8         job description for the position of intervention

 9         specialist.

10    A    Okay.

11    Q    Does this, what's been marked as Exhibit 2,

12         accurately reflect what your duties are as an

13         intervention specialist?

14    A    Yes, with the exception that I do not currently

15         supervise teacher aides.

16    Q    Okay.  Now, did your -- you explained earlier what

17         you did as a small group instructor.  Did your duties

18         change significantly from what you did as a small

19         group instructor to what you do now as an

20         intervention specialist?

21    A    Not significantly; however, we do provide support to

22         students who are not identified within the classroom

23         setting, and we are now responsible for providing

24         lesson plans.

25    Q    Before you became an intervention specialist, was it
```

Page 26

```
 1        your understanding that those individuals who held

 2        the position of intervention specialist while you

 3        were employed as a small group instructor, was it

 4        your understanding that they provided support to

 5        students who are not identified in the classroom

 6        setting?

 7   A    Yes.

 8   Q    Okay.  Was it your understanding that those

 9        individuals also provided lesson plans?

10   A    Yes.

11   Q    And how many students are currently assigned to your

12        caseload as an intervention specialist?

13   A    I believe it's 12.

14   Q    And what grades are those students in?

15   A    Sixth and seventh.

16   Q    And how many are in each grade?  How many sixth grade

17        students do you service, or, are on your caseload,

18        rather?

19   A    I believe it's eight.

20   Q    And then four seventh graders?

21   A    Correct.

22   Q    And with respect to the students on your caseload, do

23        you go into the inclusion classroom in language arts

24        and math, in their general education classrooms?

25   A    No.
```

NICOLE M. POSTON - 10/26/2017

Page 27

```
 1   Q   What do you do now?

 2   A   I am in their science and social studies classrooms.

 3   Q   And that's for both sixth and seventh grade students?

 4   A   Correct.

 5   Q   And can you explain to me what that entails, in terms

 6       of being in their science and social studies

 7       classrooms and providing services to them?

 8   A   Providing instruction, reteaching of concepts,

 9       accommodations of work, collaboration with a teacher,

10       and any other behavioral supports that the student

11       may need.

12   Q   And the instruction -- I'm sorry, I can't read my

13       writing -- the reinforcement of concepts -- I'm

14       sorry, reteaching of concepts --

15   A   Correct.

16   Q   -- accommodations, collaboration with teacher and

17       behavior supports, were those the type of services

18       that you would provide to students who were in the

19       language arts and math classrooms when you were a

20       small group instructor?

21   A   Yes.

22   Q   And with respect to the students on your caseload

23       now, do you also provide enrichment time services in

24       a small group setting?

25   A   Yes.
```

Page 28

```
 1   Q    And do you also as an intervention specialist meet

 2        with -- have TBT meetings?

 3   A    Yes.

 4   Q    And do you have those meetings each day?

 5   A    We have three days typically with our content team,

 6        one day for a meeting as a whole grade level on PBIS,

 7        and then the last day is for the grade level to meet

 8        with administration.

 9   Q    Now, when you were a small group instructor, did you

10        meet with administration as well during your TBT

11        meetings?

12   A    Yes.

13   Q    And how often would you meet with administration, for

14        example, during the 2016-17 school year?

15   A    Typically once a week.

16   Q    Now, you stated that you provide support to students

17        currently who are not identified in a classroom

18        setting.  How many students would you say you provide

19        services to who are not identified?

20   A    That's difficult to say.

21   Q    Okay.  Give me an example of a given day, how many

22        students would you need to service who were not --

23        who are not identified?  How many students would you

24        need to provide assistance to who are not identified?

25   A    The reason I'm having a hard time answering the
```

NICOLE M. POSTON - 10/26/2017

Page 29

1      question is because when I go into the classroom,

2      depending on what they're doing, they may be working

3      in pairs, for instance, on an assignment, and I may

4      be walking around assisting any student in that

5      classroom that needs assistance or reteaching or

6      guidance.

7   Q  **And you do the reteaching and guidance for students**

8      **who are not identified?**

9   A  Correct.

10  Q  **So it just varies day-to-day based on the needs of**

11     **the classroom?**

12  A  Yes.

13  Q  **And how many students in total are in those**

14     **classrooms, for example, the science classroom?**

15  A  Twenty, approximately.

16  Q  **And what about social studies?**

17  A  Again, 20, approximately.

18  Q  **And in terms of providing lesson plans, who do you**

19     **provide the lesson plans to?**

20  A  The principal.

21  Q  **And do you work with, for lack of a better word, the**

22     **regular -- the science teacher to come up with the**

23     **lesson plan?**

24  A  Correct.

25  Q  **And you also work with the social studies teacher to**

NICOLE M. POSTON - 10/26/2017

Page 30

1    create a lesson plan?

2  A  Correct.

3  Q  And is the lesson plan that you create for the

4     students who are on your caseload specifically?

5  A  No.

6  Q  It's for all of the students in the classroom?

7  A  Correct.

8  Q  Now, you stated you still report to Jarred Zapolnik,

9     who's the principal of the intermediate school.  Do

10    you now also report to the principal of the middle

11    school?

12 A  I report to Vince Lindsey as well, who is the

13    principal of the junior high.

14 Q  Junior high, okay.  And have you been evaluated by

15    Mr. Lindsey since you've been an intervention

16    specialist?

17 A  No.

18 Q  Have you been evaluated by Mr. Zapolnik?

19 A  No.

20 Q  Now, in your Complaint you stated that you have a

21    visual impairment due to, is it aniridia?

22 A  Yes.

23 Q  And that is a genetic condition, correct?

24 A  Correct.

25 Q  And you also state that you're legally blind, with a

Page 31

```
 1          corrected visual acuity of 20 over 200 or less; is

 2          that correct?

 3   A      Correct.

 4   Q      And what exactly is aniridia?

 5   A      It's a rare genetic eye condition in which, in my

 6          case, the iris of the eye did not properly form.

 7   Q      And is this a condition that you've had since birth?

 8   A      Correct.

 9   Q      Are there any medications that you take for your

10          condition?

11   A      Not specifically aniridia, no.

12   Q      Now, when you were first hired in the school

13          district, did you advise any administrators of your

14          medical condition?

15   A      Yes.

16   Q      Do you recall, were they individuals who you reported

17          to?  Was it the building principal?

18   A      The -- Chris Smith, who was district level

19          administrator who hired me, and Anne McGaughey, who

20          was the special ed. director of the district at the

21          time, who also was a part of hiring me, and then Chad

22          Agnes, who was the building principal at Bowers

23          Elementary.

24   Q      Was it Chris Smith, the one who was superintendent at

25          Canton, is that the same Chris Smith?
```

Page 32

```
 1   A    Yes.

 2   Q    What type of -- well, let me ask this.  Do you

 3        receive ongoing medical treatment for your condition?

 4   A    Yes.

 5   Q    And what type of treatment do you receive?

 6   A    Regular appointments with my eye doctor.

 7   Q    Does your treatment impact your ability to work in

 8        any way?

 9   A    No.

10   Q    And do you ever have to take extended leaves of

11        absence for your treatment related to your aniridia?

12   A    No.

13   Q    Does your treatment impact any other aspect of your

14        life?

15   A    No.

16   Q    Have you ever been physically injured while working

17        for Massillon?

18   A    No.

19   Q    Now, has your aniridia progressed or worsened since

20        you've been employed in the district?

21   A    There is variances in my condition, it can change to

22        some degree, and that's why I receive consistent

23        treatment from my eye care professional, but there

24        has not been a significant change in --

25   Q    Now, what major life activities are substantially
```

NICOLE M. POSTON - 10/26/2017

Page 33

| | | |
|---|---|---|
| 1 | | limited by your medical condition? |
| 2 | A | Seeing, reading, driving. |
| 3 | Q | **And how does it impact your ability to read?  What do** |
| 4 | | **you have to do in order to be able to read printed** |
| 5 | | **documents?** |
| 6 | A | They have to be in large type, or I have to have some |
| 7 | | way in which to magnify the document to make it |
| 8 | | large. |
| 9 | Q | **For example, when you review students' work, is that** |
| 10 | | **in large type, or do you have to use a magnifier for** |
| 11 | | **that?** |
| 12 | A | I usually use a magnifier.  I occasionally large |
| 13 | | print it. |
| 14 | Q | **And for my own edification, is it a hand-held** |
| 15 | | **magnifier, or is it like glasses that you use?** |
| 16 | A | Sometimes I use a hand-held magnifier.  Sometimes I |
| 17 | | take student work home and use my CCTV. |
| 18 | Q | **And in terms of your ability to see, how does it** |
| 19 | | **impact you on a day-to-day basis?** |
| 20 | A | Are you -- asking for clarification, are you speaking |
| 21 | | of work, or just my everyday life? |
| 22 | Q | **Your everyday life -- let's talk about work first.** |
| 23 | A | It impacts my ability to read written material. |
| 24 | | There are different techniques that I use with |
| 25 | | students to accommodate my vision impairment. |

NICOLE M. POSTON - 10/26/2017

Page 34

1   Q   What type of techniques are those?

2   A   Well, for example, instead of having them write in

3       pencil on a piece of paper, I may have them write on

4       a white board with a marker.

5   Q   Okay.

6   A   I have to adjust how I move about a classroom in

7       order to be in a position to visually monitor

8       students.

9   Q   Anything else you can think of?

10  A   It impacts my ability to see presentations if they're

11      done on a TV screen or a projection screen of some

12      sort, videos or PowerPoint presentations.

13  Q   And how does your condition -- I'm sorry, are you

14      finished?

15  A   I think so.

16  Q   Now, how does your aniridia substantially limit your

17      ability to travel?

18  A   I drive with a restricted license, and which I must

19      use a bioptic driving device and I must travel during

20      daylight time only.

21  Q   Any other way it limits your ability to travel?  And

22      by "travel" we're talking about driving?

23  A   Well, I was talking about driving.

24  Q   You were talking about driving, okay.

25  A   Are you speaking of travel as in physical travel?

NICOLE M. POSTON - 10/26/2017

Page 35

1    Q    Well, in the Complaint it says substantially limited

2         your ability to see, read and travel, so I just want

3         to make sure we have the same understanding of what

4         "travel" means, and you described driving.

5    A    That's the primary.

6    Q    Okay.

7    A    However, when walking in crowded areas it can be

8         difficult to see things that might be a distance

9         ahead of me, or seeing signs if I'm going to, like, a

10        bus station or -- that impacts my travel.

11   Q    Does having extra lighting help your ability to see

12        at all?

13   A    No, not necessarily.  I am actually photophobic, so,

14        for instance, sunlight is not great.

15   Q    Okay.

16   A    Generally speaking indoor lighting is usually

17        sufficient.

18   Q    And can you describe how your medical condition

19        affects you in your daily activities?  Are you

20        able -- does it impact your ability to care for

21        yourself on a day-to-day basis?

22   A    I've learned alternative techniques to ensure that I

23        can take care of myself.

24   Q    And what about shopping, whether it's food or

25        clothes, does it impact your ability to perform those

NICOLE M. POSTON - 10/26/2017

Page 36

```
 1        tasks?
 2   A    I'm able to shop.
 3   Q    Now, does your condition limit you in your ability to
 4        work as an intervention -- as a teacher in general,
 5        whether it's a small group instructor or intervention
 6        specialist?
 7   A    It doesn't impact me as long as I have
 8        accommodations.
 9   Q    And what percentage of your day involved -- would you
10        say involved reading as a small group instructor?
11   A    Sixty percent.
12   Q    And is the 60 percent primarily inclusive of the
13        services that you provided to students on a
14        day-to-day basis?
15   A    No.
16   Q    Okay.  What else did the reading entail, the
17        60 percent?
18   A    It would entail reading materials or documents,
19        whether it be IEPs, ETRs.
20   Q    Student work?
21   A    Student work, professional material provided by
22        administration.
23   Q    What percentage, out of the 60 percent, would you say
24        involved reading professional material provided by
25        administration?
```

NICOLE M. POSTON - 10/26/2017

Page 37

```
 1   A   Asking for clarification, are you speaking on a daily

 2       basis?

 3   Q   Yes, because I asked what percentage of your day

 4       involved reading as a small group instructor, and you

 5       said 60 percent.

 6   A   Ten percent.

 7   Q   What percentage of your day involved traveling as a

 8       small group instructor?  And we discussed driving,

 9       and then you mentioned walking as well.  We can take

10       out driving.  Let's say traveling to and from

11       classrooms or meetings.

12   A   What percentage?

13   Q   Yes.

14   A   Five percent.

15   Q   Five percent.  And what percentage of your day

16       involves reading as an intervention specialist?

17   A   Sixty.

18   Q   And similar to when you were a small group

19       instructor, does 10 percent of that involve

20       professional materials provided by administration?

21   A   Yeah.

22   Q   And as an intervention specialist, what percentage of

23       your day involves traveling back and forth to

24       classrooms throughout the building?

25   A   Ten percent.
```

Page 38

```
 1   Q   If we can take a look back at your small group
 2       instructor job description, and you had an
 3       opportunity to look at the Essential Functions --
 4   A   Um-um.
 5   Q   -- of the position, are there any specific job tasks
 6       or Essential Functions that are listed that are
 7       problematic as a result of your substantial
 8       limitation in the activity of seeing or reading?
 9                 MS. WHITE:  Can you clarify whether
10            that's with or without accommodations?
11                 MS. MASSEY:  With or without
12            accommodation.  Do you want me to ask her
13            with accommodation or --
14                 MS. WHITE:  I think so, to be fair,
15            yeah.
16   Q   So without an accommodation, what specific jobs or
17       tasks are problematic as a result of your substantial
18       limitation in the activity of seeing or reading?
19   A   "Follow individual students IEPs.
20        "Ensure students are learning all subject
21       material by reinforcing the completion of
22       assignments."
23   Q   Say that again, I'm sorry.
24   A   "Ensure students are learning all subject material by
25       reinforcing the completion of assignments.
```

NICOLE M. POSTON - 10/26/2017

1          "Maintain and improve professional competence.

2          "Assess the accomplishments of students on a

3     regular basis and provide progress reports as

4     required.

5          "Assist the administration in implementing all

6     procedures and rules governing student life and

7     conduct, and develop reasonable rules of classroom

8     behavior and procedure for the classroom, and

9     maintain order in the classroom in a fair and just

10    manner.

11         "Follow the scope and sequence of the

12    instructional program as defined in the content

13    standards which have been approved by the Board of

14    Education.

15         "Act as a teacher, facilitator and information

16    source in subject area specialty.

17         "Teach new concepts and facilitate different

18    activities enabling students to learn in different

19    ways.

20         "Participate in building 'teams' when requested

21    and agreed upon.

22         "Organize various subject-specific programs

23    within assigned building."

24  Q   **I just want to make sure we're still talking about**

25      **seeing and reading.**

NICOLE M. POSTON - 10/26/2017

```
1   A     "Attend meetings and in-services required by the

2         principal/director of pupil services/superintendent."

3              I do believe all those involved reading in some

4         manner.

5   Q     What about travel, which duties are problematic

6         without an accommodation in terms of travel?

7   A     "Attend parent-teacher conferences.

8              "Attend IEP meetings.

9              "Attend educational field trips.

10             "Make provisions for being available to students

11        and parents for educational-related purposes outside

12        the instructional day.

13             "Participate on building 'teams' when requested

14        and agreed upon.

15             "Attend meetings and in-services required by the

16        principal/director of pupil services/superintendent."

17  Q     And with respect to the job description, what

18        specific job tasks are problematic as a result of

19        your substantial limitation in activities of seeing

20        and reading with an accommodation?

21  A     There are none.

22  Q     Okay.  What about what specific job tasks are

23        problematic as a result of your substantial

24        limitation in the activity of traveling with an

25        accommodation?
```

Page 41

1  A    There are none.

2  Q    **I'm going to do the same thing for the position of**

3       **intervention specialist.  Take a look at that.  What**

4       **specific -- referring to Exhibit 2, sorry, what**

5       **specific job tasks are problematic as a result of**

6       **your substantial limitation in the activity of seeing**

7       **and reading without an accommodation?**

8  A    "Prepare clear and timely lesson plans.

9           "Attend meetings and in-services as required.

10          "Assess the accomplishments of students on a

11      regular basis and provide progress reports as

12      required.

13          "Work with regular classroom teachers in

14      co-teaching or inclusion setting.

15          "Follow individual student IEPs."

16 Q    **And what specific job tasks are problematic as a**

17      **result of your substantial limitation in the activity**

18      **of traveling without an accommodation?**

19 A    "Attend meetings and in-services as required.

20          "Attend parent-teacher conferences.

21          "Attend IEP meetings."

22          Asking for clarification, do I see anything

23      under the Other Duties and Responsibilities section?

24 Q    **Yes, we can go through those.**

25 A    "Attend staff/IEP/behavior management team/evaluation

Page 42

```
1           and curriculum meetings as necessary."

2      Q    Looking at the job description again for intervention

3           specialist, what specific job tasks are problematic

4           as a result of your substantial limitation in the

5           activity of seeing and reading with an accommodation?

6      A    None.

7      Q    What about with an accommodation for traveling?

8      A    None.

9      Q    Do you ever have to take any breaks during the day to

10          rest your eyes at all if and when you become

11          fatigued?

12     A    I have during my lunchtime.

13     Q    During your lunchtime?

14     A    Um-um.

15     Q    And how long would you say on average?

16     A    It varies.

17     Q    Any other times you need to take a break to rest your

18          eyes outside of lunchtime during your workday?

19     A    I don't typically have any other time.

20     Q    So that's no?

21     A    No.

22              MS. MASSEY:  Can we take a five minute

23          break?

24              MS. WHITE:  Um-um.

25                  - - - -
```

NICOLE M. POSTON - 10/26/2017

Page 43

```
 1                    (Thereupon, a recess was had.)

 2                         - - - -

 3   Q    Now, in paragraph 12 of your Complaint, it states

 4        that "At the time she was hired, Plaintiff informed

 5        Defendant personnel of her disability and her need

 6        for a reasonable accommodation in accessing printed

 7        and written material."  You may not recall that

 8        specific paragraph, but do you recall your Complaint

 9        having some information in there concerning the fact

10        that you notified the district of your need for a

11        reasonable accommodation when you were hired?

12   A    Yes.

13   Q    Okay.  And do you recall which Defendant personnel

14        you notified of your need for a reasonable

15        accommodation in accessing printed and written

16        material at the time of your hire?

17   A    Anne McGaughey, who was the special education

18        director at the time --

19   Q    Okay.

20   A    -- and Chad Agnes, the principal.

21   Q    And Chad Agnes was the principal of, was that

22        Bowers --

23   A    Yes.

24   Q    -- Elementary?

25             Now, did you notify them verbally of your need
```

NICOLE M. POSTON - 10/26/2017

Page 44

```
 1        for an accommodation?

 2   A    Correct.

 3   Q    Did you notify them in writing at all?

 4   A    I don't recall.

 5   Q    And what type of accommodation at the time you were

 6        hired did you ask for in accessing printed and

 7        written material?

 8   A    I asked for everything to be provided to me in large

 9        print.

10   Q    And did you specify a particular font size at that

11        time?

12   A    If I recall, they asked me to show them an example.

13   Q    And do you recall the font size of the example you

14        provided to them?

15   A    No.

16   Q    Did you ask for any assistive technology as a

17        reasonable accommodation after you were hired?

18   A    Not immediately.

19   Q    When after you were hired did you ask for assistive

20        technology as a reasonable accommodation?

21   A    The third year in the district.

22   Q    And what type of technology did you ask for?

23   A    I asked for ZoomText, which is a magnification and

24        reading software.

25   Q    Was that provided to you?
```

NICOLE M. POSTON - 10/26/2017

Page 45

1    A    Yes, at the beginning of my fourth year.

2    Q    **And do you recall who you asked for the ZoomText?**

3    A    John Graven.

4    Q    **What was John Graven's title at the time?**

5    A    I don't know if this was the official title, but he

6         was the special education director.

7    Q    **So did he replace Anne McGaughey?**

8    A    Yes.

9    Q    **And did John Graven, was he the one responsible for**

10        **getting you the ZoomText, did he provide it to you,**

11        **or did someone in technology get it to you?**

12   A    He's the one that did the research on it to ensure it

13        was the proper accommodation from the district

14        standpoint.  I believe that the technology department

15        was the one that actually did the purchase, possibly.

16        They were the ones that installed it.

17   Q    **Any other technology, other than the ZoomText, at**

18        **that time?**

19   A    No.

20   Q    **Any assistive devices or anything like that that you**

21        **requested at the time you were initially hired, other**

22        **than technology?**

23   A    Not that I recall.

24   Q    **And at the time you were hired, did you request an**

25        **accommodation in terms of travel?**

NICOLE M. POSTON - 10/26/2017

Page 46

```
 1   A    Yes.
 2   Q    And what did you request?
 3   A    That there was some leniency on arrival and departure
 4        times from meetings.
 5   Q    And was that accommodation provided to you?
 6   A    Yes.
 7   Q    Now, during your employment as a small group
 8        instructor, you would have been responsible for
 9        attending IEP meetings; is that correct?
10   A    Yes.
11   Q    And did parents ever request to meet with you outside
12        of your nonrestricted arrival and departure times?
13   A    None that I recall.
14   Q    I want to clarify, is that during your entire
15        employment as a small group instructor?
16   A    None that I can remember.
17   Q    Okay.  And when you were a small group instructor,
18        let's say in the last few years at the intermediate
19        school, what time did you typically hold IEP
20        meetings, or, what time were they typically held?
21   A    Typically they were held during the teachers
22        conference period.
23   Q    And what time was that?
24   A    It varied from year to year.
25   Q    During the '16-17 school year, do you recall what
```

Page 47

1          time that would have been, the conference period?

2    A     Maybe 9:30.

3    Q     Okay.  Do you recall any meetings being held while

4          you were at the intermediate school before 9:30, any

5          IEP meetings?

6    A     Not that I recall.

7    Q     Okay.  And in terms of travel, do you recall any

8          other meetings being held before your

9          arrival/departure time that you had to attend?

10   A     Are we speaking of, so like staff meetings or

11         anything?

12   Q     So let's start with staff meetings first.

13   A     And your question is, again?

14   Q     Do you recall any meetings being held before your

15         normal arrival time, when you were at the

16         intermediate school as a small group instructor?

17   A     Not before.

18   Q     And what was your arrival time?

19   A     8:20.

20   Q     And what time did your day start, officially?

21   A     8:20.

22   Q     8:20.  So you would arrive at work at 8:20, and your

23         day would start at 8:20?  I just want to be clear.

24   A     Well, what do you mean by my day starting?

25   Q     What is the official teacher day start time, or what

NICOLE M. POSTON - 10/26/2017

1         was the official teacher start time?

2    A    The official day for small group instructors or

3         teachers was from 8:20 to 3:20.

4    Q    **Did you arrive to school before 8:20 in order to**

5         **prepare for your day?**

6    A    If the daylight would allow it.

7    Q    **And is there a typical time of year where the**

8         **daylight allows for you to get to work before 8:20?**

9    A    The beginning of the school year and the end of the

10        school year.

11   Q    **And during the time you were a small group**

12        **instructor, let's do from before the 2013-2014 school**

13        **year, do you recall any professional development**

14        **trainings being held before your 8:20 start time?**

15   A    Not that I recall.

16   Q    **Now, in paragraph 20 of your Complaint, it states**

17        **that "From 2002 to 2013 Defendant regularly provided**

18        **Plaintiff with written materials in large print as a**

19        **reasonable accommodation and accommodated Plaintiff's**

20        **night driving limitation by scheduling meetings**

21        **during the day where possible."  So from 2002 to**

22        **2013, did Defendant always provide you with**

23        **accessible printed and written materials for**

24        **meetings, let's start with for meetings?**

25   A    Yes.

NICOLE M. POSTON - 10/26/2017

Page 49

1   Q   What about professional development, were you always

2       provided with accessible printed and written

3       materials from 2002 to 2013?

4   A   Almost always.

5   Q   And by "almost always," is there a percentage that

6       you could attribute to how often you were not

7       provided with materials in an accessible format

8       between 2002 and 2013?

9   A   Like one percent.

10  Q   When you were not provided with materials in an

11      accessible format, what did you do?

12  A   Asked that they provide it at a later time.

13  Q   And who did you ask to provide it at a later time,

14      who did you speak to?

15  A   Whoever was providing the training.

16  Q   And when you asked those individuals to provide those

17      materials at a later time, did they provide them to

18      you in an accessible format?

19  A   Yes.

20  Q   Now, between 2002 and 2013, did you ever tell anyone

21      while the training was going on that you needed

22      materials in an accessible format, while the training

23      was taking place?

24  A   No.

25  Q   And why not?

NICOLE M. POSTON - 10/26/2017

Page 50

1   A   It would have been disruptive to the process, to the

2       presentation.

3   Q   **And between 2002 to 2013, did you ever have your**

4       **computer with you during these presentations in order**

5       **to review the documents, the handouts?**

6   A   No, because I did not have a laptop.

7   Q   **Now, between 2002 and 2013, did you keep track of the**

8       **number of times you were not provided with printed**

9       **and written materials in an accessible format?**

10  A   No.

11  Q   **And why not?**

12  A   Because it was rare.

13  Q   **And you stated earlier that you gave an example of a**

14      **document to the administration showing what size font**

15      **you needed in order to review printed and written**

16      **materials.  At some point between 2002 and 2013, did**

17      **you request that documents be provided in any**

18      **specific font size?**

19  A   Not that I recall.

20  Q   **Now, between 2002 and 2013, was there a particular**

21      **administrator who was primarily responsible for**

22      **providing you with printed and written materials in**

23      **an accessible format?**

24  A   There were two primary, one was always the principal,

25      and the other was John Graven, director of special

NICOLE M. POSTON - 10/26/2017

Page 51

```
 1        education.
 2   Q    And what steps did John Gravin take to verify that
 3        you had printed and written materials in an
 4        accessible format?  Did he get them to you in
 5        advance?
 6   A    In some cases he got them to me in advance, in other
 7        times he provided them to me at the meeting or
 8        in-service.
 9   Q    Do you know whether Mr. Graven advised other
10        individuals of the need for you to have documents in
11        a larger print?
12   A    Yes, it's my understanding that he had communicated
13        with other administration regarding that need.
14   Q    And you also said the principal also was primarily
15        responsible for providing printed and written
16        materials in an accessible format.  Was there a
17        specific individual, or just whomever held the
18        principal position?
19   A    Whomever held the principal position.
20   Q    And this would be at the three buildings you were in,
21        being Bowers Elementary?
22   A    Um-um.
23   Q    York Learning Center?
24   A    Yes.
25   Q    And then Massillon Middle/Intermediate School?
```

NICOLE M. POSTON - 10/26/2017

Page 52

```
 1   A    Yes.

 2   Q    Did you regularly communicate with John Graven

 3        regarding your accommodation needs?

 4   A    Yes.

 5   Q    How often would you say you spoke with him?

 6   A    Once a month.

 7   Q    And what did those conversations typically entail

 8        once a month?

 9   A    Where accommodations were anticipated to be needed,

10        or if there were individuals who were needing his

11        assistance in understanding what was needed.

12   Q    And at this time, between 2002 and 2013, were there

13        any other accommodations provided, other than

14        providing you with documents and written materials in

15        an accessible format and accommodating your travel

16        restrictions?

17   A    Well, the ZoomText was an accommodation.

18   Q    ZoomText.  Anything else?

19   A    I don't know if this goes along with the travel

20        restrictions, but there was the accommodation of

21        adjusting meeting times.

22   Q    Okay.  Other than John Graven and the applicable

23        principal, did any other administrators in the

24        district ensure you were provided with printed and

25        written materials in an accessible format between
```

Page 53

1     2002 and 2013?

2  A  I do remember Renee Parr and Kathy Kallekar Nolan,

3     who were at the time involved in the curriculum

4     department, did provide some accessible materials,

5     accommodated materials to me.

6  Q  And between 2002 to 2013, did you ever speak with the

7     superintendent about your need for a reasonable

8     accommodation?  By "superintendent," I just mean the

9     person who held that position at any given time.

10 A  Yes.

11 Q  Okay.  And do you recall who you spoke with, which

12    superintendent you spoke with about your need for

13    accommodation between 2002 and 2013?

14 A  I spoke to two different superintendents.

15 Q  Okay.  And who were they?

16 A  The first one was Fred Blosser, and I communicated

17    with him through writing about the need for time to

18    large print materials.

19 Q  And was that accommodation provided to you?

20 A  Yes.

21 Q  And who was the other superintendent?

22 A  Lisa Carmichael.

23 Q  And what did you discuss with Lisa Carmichael between

24    2002 and 2013?

25 A  I spoke with her by phone, and we discussed the

NICOLE M. POSTON - 10/26/2017

```
 1        accommodation of being placed on -- as priority for

 2        technology issues.  So that was actually an

 3        additional accommodation that was provided to me as

 4        well.

 5    Q   And in terms of priority, did that entail updates to

 6        your software, or what did that involve?

 7    A   That involved if I was having technology issues or if

 8        my computer was down, it wasn't working properly.

 9    Q   So you would be able to have access immediately to

10        the technology department?

11    A   Yes.

12    Q   And was that accommodation provided?

13    A   Yes.

14    Q   Did you have occasion to speak with the assistant

15        superintendent between 2002 and 2013 regarding your

16        need for an accommodation?

17    A   Possibly.

18    Q   Do you recall any specific conversations between 2002

19        and 2013?

20    A   I don't recall any specifics.

21    Q   Do you recall having any issues with your request for

22        an accommodation in speaking with the assistant

23        superintendent?

24    A   I do remember a request that I made to the assistant

25        superintendent about an adjustment to a meeting time.
```

NICOLE M. POSTON - 10/26/2017

Page 55

1  Q    And that was between 2002 and 2013?

2  A    Yes.

3  Q    And was the meeting time adjusted?

4  A    Yes.

5  Q    And in terms of your need for scheduling meetings

6       during the day in order to accommodate your travel

7       restrictions, between 2002 and 2013, did you

8       primarily work with your building principal on those

9       issues?

10  A    Yes.

11  Q    Okay.  And you were provided with accommodations?

12  A    Yes.

13  Q    Did you work with John Graven on any travel?

14  A    Yes.

15  Q    And you received accommodations?

16  A    Correct.

17  Q    Okay.  And then you just noted that you spoke with

18       the assistant superintendent --

19  A    Yes.

20  Q    -- and were accommodated.  And who was the assistant

21       superintendent with whom you spoke?

22  A    Mark Fortner.

23  Q    Were there any other administrators with whom you

24       spoke about travel restrictions between 2002 and

25       2013?

NICOLE M. POSTON - 10/26/2017

Page 56

```
 1   A    Not that I recall.
 2   Q    Now, between 2002 and 2013, was there an
 3        accommodation plan written or otherwise put into
 4        place with respect to your request for an
 5        accommodation?
 6   A    No.
 7   Q    Okay.  Between 2002 and 2013, do you believe the
 8        district engaged in the interactive process to
 9        determine what your needs were from an accommodation
10        standpoint?
11   A    Yes.
12   Q    Now, in response to interrogatory number six, and
13        I'll just tell you what we asked you, to identify
14        each administrator Plaintiff informed of her
15        disability-related need for reasonable accommodations
16        in accessing printed and written materials in
17        paragraphs 89, 102 and 112 between January 2014
18        through present, and you listed 10 individuals.  I'm
19        just going to ask you a few questions.  The first
20        person you listed was superintendent Richard
21        Goodright.  Do you recall when you may have first
22        advised him of your need for a reasonable
23        accommodation?
24   A    When he received the first accommodation plan.
25   Q    So that would have been in 2014?
```

NICOLE M. POSTON - 10/26/2017

Page 57

```
 1   A    Correct.

 2   Q    Okay.  The second person you listed was Mark Fortner,

 3        the assistant superintendent.  Do you recall when you

 4        first advised him of your need for an accommodation?

 5   A    What time period are we speaking of again?

 6   Q    Well, this was between -- the question related to

 7        January 2014 through present.  Did you advise Mark

 8        Fortner -- when did you advise Mark Fortner of your

 9        need for an accommodation?

10   A    Well, from January 2014 moving forward, it would have

11        been the accommodation plan as well.

12   Q    And it sounds like you had a conversation with him

13        before January 2014 for your -- regarding your need

14        for an accommodation?

15   A    Yes, I reached out to him prior to January 2014.

16   Q    Do you recall when the first time was you might have

17        had a conversation with him about your need for an

18        accommodation?

19   A    No, I don't recall when the first time was.

20   Q    The third person was Elaine Karp, former director of

21        student services.  Did you have any conversations

22        with Elaine Karp prior to January 2014 regarding your

23        need for an accommodation?

24   A    No, not prior to.

25   Q    Christine Dieringer is listed as number four.  Did
```

NICOLE M. POSTON - 10/26/2017

Page 58

1    you have any conversations with her prior to January

2    of 2014 regarding your need for an accommodation?

3  A  Yes.

4  Q  Okay.  Do you recall when you might have spoken with

5    Christine Dieringer?

6  A  Age 15.

7  Q  Okay.  All right.

8  A  She -- can we go off the record for a minute -- she

9    was my principal --

10 Q  Okay.  Got you.

11 A  -- at Jackson High School.

12 Q  Okay.  Let's narrow it a bit.  In your capacity as an

13   employee of the Massillon City School District.

14 A  Prior, no.

15 Q  Okay.  And we've already discussed John Graven, the

16   fact that he knew prior to January of 2014 of your

17   need for an accommodation?

18 A  Correct, yes.

19 Q  What about Kris Blair, did she know -- prior to

20   January of 2014, did you have a conversation with her

21   about your need for an accommodation?

22 A  No.

23 Q  You would have had a conversation with Jarred

24   Zapolnik prior to January of 2014 regarding your need

25   for an accommodation, correct?

NICOLE M. POSTON - 10/26/2017

Page 59

```
 1   A    Did I?

 2   Q    Yes.

 3   A    No.

 4   Q    When did he become the principal?  Do you recall when

 5        he --

 6   A    He was starting with the 2014-15 school year.

 7   Q    Did you have any conversations with Vince Lindsey

 8        before January of 2014?

 9   A    No.  He started the same year as Jarred did.

10   Q    What about Jennifer Allerding, did you have any

11        conversations with her prior to January of 2014?

12   A    Yes.

13   Q    Do you recall when?

14   A    I don't remember exactly.  It was when she started.

15   Q    And do you recall what you discussed with

16        Ms. Allerding?

17   A    I sat down with her and explained any accommodations

18        that I needed and the reason for my need for

19        accommodations.

20   Q    And she was the principal of which building at that

21        time that you spoke to her?

22   A    I don't remember.

23   Q    Okay.

24   A    Because there was a point in time when she was over

25        both sides of the building --
```

NICOLE M. POSTON - 10/26/2017

Page 60

```
1    Q    Okay.

2    A    -- so I don't --

3    Q    When you had a conversation with her prior to January

4         of 2014 --

5    A    Yes.

6    Q    -- did she assist you with being provided with any

7         reasonable accommodations before January 2014?

8    A    Yes.

9    Q    Okay.  And do you recall what those accommodations

10        were?

11   A    Adjustments to arrival and departure times and large

12        print materials.

13   Q    And the last individual you listed in response to

14        interrogatory number six was Dan McGrath, who was

15        principal.  Did you speak with him prior to January

16        of 2014 regarding your need for an accommodation?

17   A    Yes.

18   Q    And do you recall when?

19   A    Not exactly.  Again, it was when he started.

20   Q    Okay.  And do you recall what you discussed with

21        Mr. McGrath?

22   A    I discussed my need for accommodations and what those

23        accommodations were.

24   Q    And did Mr. McGrath assist you in being provided with

25        those accommodations?
```

NICOLE M. POSTON - 10/26/2017

Page 61

 1   A    Yes.

 2   Q    And then also, just to be clear, it also says

 3        additional administrators were not verbally

 4        addressed, but these additional administrators were

 5        also informed via the written accommodation plan of

 6        the need due to Plaintiff's disability for reasonable

 7        accommodations to access printed and written

 8        materials.  So you mention other administrators, but

 9        these 10 individuals were the only ones who you

10        listed specifically.

11   A    (Witness nodding head affirmatively.)

12   Q    Do you know of any other employee who has requested a

13        reasonable accommodation from the district?

14   A    Yes.

15   Q    Okay.  How many employees are you aware of who have

16        requested reasonable accommodations from the

17        district?

18             MS. WHITE:  I'm going to object at this

19             point.  I'm not sure if that's really

20             relevant.  It also kind of digs into other

21             folks' privacy concerns.

22             MS. MASSEY:  Okay.  It's noted.

23   Q    Do you know how many other individuals have requested

24        reasonable accommodations from the district?

25   A    To my knowledge, one.

Page 62

1   Q    One.

2                    MS. MASSEY:  I don't know if this would

3              be a good time to break.

4                    MS. WHITE:  I'm ready if you are.

5                    MS. MASSEY:  Okay, yeah, then I'll

6              finish up when we get back.

7                           - - - -

8              (Thereupon, a luncheon recess was had.)

9                           - - - -

10                   MS. MASSEY:  We're back on the record.

11  Q    Now, paragraph 21 of your Complaint states that

12       "Beginning in January 2014 and continuing to present,

13       Defendant has failed to provide Plaintiff with

14       accessible printed and written materials, including

15       information on workplace policies, staff training

16       materials and information regarding workplace

17       evaluations."  Now, what is your understanding of

18       what a reasonable accommodation means?

19  A    That it doesn't cause undue hardship to the employer.

20  Q    And what was significant about January of 2014?  You

21       say in January 2014 that's when you stopped

22       consistently, I guess, being provided with accessible

23       printed and written materials.

24  A    The -- so we created an accommodation document that

25       identified the accommodation being provided, written

NICOLE M. POSTON - 10/26/2017

Page 63

```
 1        materials in accessible format, and after that
 2        document was created, there was occasions in which
 3        documents were not provided in an accessible large
 4        print format for trainings and in-services.
 5    Q   So you testified earlier that there was no written or
 6        otherwise accommodation plan in place from 2002 to
 7        2013, correct?
 8    A   Yes.
 9    Q   What were the circumstances that led up to an
10        accommodation plan being created in 2014?
11    A   There was a request for a meeting to be -- time to be
12        adjusted to accommodate my travel restrictions, and
13        the accommodation that was requested was not granted
14        and no alternative was offered.
15    Q   You said and no alternative was offered?
16    A   Correct.
17    Q   Now, during this time period in January of 2014, the
18        Board and the AGT were in the midst of negotiations,
19        correct?
20    A   I believe so.
21    Q   Okay.  And the meeting time that you were asking to
22        be adjusted, what type of meeting was that?
23    A   That was a meeting between building principals and
24        the small group teachers at the middle school level
25        to address an issue regarding schedules.
```

Page 64

1  Q   And who did you ask to adjust the meeting time?

2  A   The request was made to both Dan McGrath and Jen

3      Allerding.  Dan McGrath was the one that responded.

4          I also, after several communications between

5      myself and Dan McGrath, I also reached out to Mark

6      Fortner, but never received a response.

7  Q   So in response to this, this issue, did you file a

8      complaint?

9  A   I did.

10 Q   Okay.  And was the accommodation plan developed as a

11     result --

12 A   Yes.

13 Q   -- of your discussions with administration?

14 A   Yes.

15 Q   Okay.  Now, I don't intend to use this as a

16     document -- as an exhibit, but I provided a copy of a

17     document to your attorney late yesterday.  Do you

18     remember creating a document about your story that

19     you provided to the Board of Education at some point,

20     just kind of giving your perspective on --

21 A   Yes.

22 Q   And do you recall stating in the document that you

23     asked, you know, I guess three times a total from

24     December 2013 to January 2014 for an accommodation,

25     and you state "However, after being denied the

NICOLE M. POSTON - 10/26/2017

Page 65

```
 1          accommodation on a third attempt by a building

 2          administration and was also ignored by the

 3          superintendent's office, I came to realize that it

 4          wasn't a misunderstanding at all.  Instead, I came to

 5          believe that part of the reason for the sudden change

 6          was due to the deterioration of the relationship

 7          between the union and the administration."  So do you

 8          believe that in some part you weren't provided with

 9          the accommodation because of something relating to

10          union and Board negotiations?

11     A    I believe that that could be a contributing factor.

12     Q    Why?

13     A    Because the meeting was based upon a union issue in

14          which a grievance had been filed.

15     Q    Is it safe to say you didn't believe that they were

16          treating you differently because you were disabled,

17          correct?

18     A    I believe that was also a contributing factor.

19     Q    Why?

20     A    Because it was an accommodation that had been

21          provided in the past by administration, and it was

22          not being provided at that time.

23     Q    Why would it be based on your disability if, as you

24          said, they had been providing you with an

25          accommodation?  You said from 2002 to 2013, you know,
```

```
 1          they were providing you with the accommodations as
 2          requested.  So why would the change be on the basis
 3          of your disability?
 4   A      Well, the reality is I don't know what their reason
 5          was.
 6   Q      Now, when did you start keeping track of the
 7          instances when you were not provided with accessible
 8          printed and written materials?
 9   A      2014.
10   Q      Do you recall when in 2014?
11   A      No.
12   Q      And why did you start keeping track of the instances
13          where you weren't provided with accessible printed
14          and written materials?
15   A      To protect myself.
16   Q      And now, you stated earlier that between 2002 and
17          2013 you didn't keep track of the instances where you
18          weren't provided with materials in accessible format.
19          Why would you start doing it in 2014?
20   A      Because it was frequent.
21   Q      And when did it start becoming frequent?  What do you
22          mean by "frequent"?
23   A      It started -- it became frequent I would say as of
24          May of 2014.
25   Q      In response to interrogatory number 10, we asked you
```

Page 67

```
 1          for any person identified in answer to interrogatory

 2          number nine, and that question related to the

 3          individuals that we asked you to identify any

 4          employee of Defendant who discriminated against you

 5          on the basis of your disability, in interrogatory

 6          number 10 we asked you for the individuals who you

 7          identified, for you to identify any and all actions

 8          each took that allegedly discriminated against you on

 9          the basis of your disability, and in different

10          instances you listed the individuals, either, you

11          know, administrators failed to ensure that

12          administrators were following your accommodation plan

13          or failed to respond, and you also listed instances

14          where individuals provided you with -- failed to

15          provide you with materials, and some of them date

16          back to January of 2014.  So is it safe to say that

17          you started documenting this before May of 2014?

18    A     Not necessarily.

19    Q     Not necessarily?

20    A     I have a pretty good memory.

21    Q     Okay.  So when you started documenting in May of

22          2014, you went back to the previous months and

23          remembered other instances where you weren't

24          provided with materials?

25    A     Yes.
```

Page 68

1  Q    Now, instead of keeping track of each of these --

2       instead of keeping track of each of these instances

3       that you weren't provided with materials, was there

4       some reason why you just didn't just continue to work

5       with John Graven on the issue of written and printed

6       materials?

7  A    John Graven retired.

8  Q    When did he retire?

9  A    I believe it was that spring.

10  Q   The spring of?

11  A   2014.

12  Q   Okay.  But you said that some of these happened -- I

13      mean, in your response to interrogatories it seems

14      that some of these instances began to happen as early

15      as January of 2014.  Did you talk to him about your

16      need for accessible written and printed materials

17      before -- between the time in January of 2014 and

18      when he retired?

19  A   I do remember one occasion where he and I had a

20      verbal conversation, and his response to me was

21      there's a new sheriff in town.

22  Q   And when did that conversation take place?

23  A   I don't recall.

24  Q   Did Mr. Graven attempt to assist you in getting

25      access to written and printed materials during that

Page 69

```
 1        time after making that comment?

 2    A   I don't remember.  I don't recall any particular

 3        time, no.

 4    Q   Did you attempt to talk to any other administrators

 5        about providing you with documents in written and

 6        printed accessible form between January and May of

 7        2014, when you started documenting these instances?

 8    A   Yes.  I had a conversation with Dan McGrath, and we

 9        discussed his knowledge of my accommodation plan,

10        which he seemed to have no knowledge of.

11            I spoke to, I believe it was Marcus Simpson --

12    Q   I'm sorry, what was the name?

13    A   Marcus Simpson, sorry.

14    Q   Marcus Simpson.

15    A   -- and just briefly asked if he was aware of the

16        accommodation plan and its contents.

17            I reached out to James Thom and asked him about

18        his knowledge of the accommodation plan.

19            And that was when I reached out to my attorney

20        and Board counsel.

21    Q   And what was the time frame that you would have had

22        conversations with Dan McGrath, Marcus Simpson and

23        James Thom before reaching out to your attorney and

24        representatives?

25    A   Within, within a month after the accommodation plan
```

NICOLE M. POSTON - 10/26/2017

Page 70

```
 1        was created.
 2   Q    Now, isn't it true that after you filed your
 3        complaint in January of 2014, that the district
 4        engaged in an interactive process with you to develop
 5        an accommodation plan?
 6   A    Yes.
 7                    MS. MASSEY:  And this is Exhibit 3.
 8                        - - - -
 9                    (Thereupon, Defendant's Exhibit 3 was
10                  marked for identification.)
11                        - - - -
12   Q    And I'm also providing you with an enlarged copy of
13        this one.
14   A    Yes; yes.
15   Q    And can you identify the document for the record?
16   A    This is a summary of the reasonable accommodations
17        plan.
18   Q    Dated February 3, 2014, correct?
19   A    Yes.
20   Q    Okay.  And in this accommodations plan, it suggests,
21        it says "Reasonable accommodations for the 2013-14
22        school year and future years," and the district
23        agreed to provide you with a large screen computer
24        monitor.  And was that provided to you?
25   A    Yes.
```

Page 71

1  Q    Okay.  ZoomText?

2  A    Yes.

3  Q    That was provided to you --

4  A    Yes.

5  Q    -- is that correct?

6           And it talks about IT in-service and in-service

7         involving IT.  Was that provided to you as well?

8  A    Yes.

9  Q    And did you use the ZoomText or another computer

10        during in-services and trainings?

11 A    Yes.

12 Q    How often have you used the ZoomText and computer

13        during in-services and trainings?

14 A    Whenever it's needed, so long as it was working

15        properly.  There was an occasion at some point that

16        it didn't work properly, but every other time.

17 Q    There was an occasion when it didn't work properly.

18        Do you recall when that was?

19 A    That was prior to the district providing me my own

20        laptop, because the district would provide me with a

21        laptop for the in-service and they would put a 30 day

22        trial of ZoomText on the laptop for me to use at that

23        particular time.

24 Q    Okay.  Now, was it helpful for you to have ZoomText

25        and access to a computer during in-services and

NICOLE M. POSTON - 10/26/2017

Page 72

```
 1        trainings?
 2   A    Yes.
 3   Q    Is that accommodation currently being provided to
 4        you?
 5   A    Yes.
 6   Q    And then in number four it says "IT Priority Status -
 7        the district has provided and will continue to have
 8        its IT department place Ms. Poston on priority status
 9        for issues related to Ms. Poston's computer system."
10        Was that accommodation provided to you?
11   A    Yes.
12   Q    And is that still being provided to you?
13   A    Yes.
14   Q    And getting back to number two, is the ZoomText
15        accommodation still being provided to you?
16   A    Yes.
17   Q    And one, is the large screen computer monitor still
18        being provided to you as a reasonable accommodation?
19   A    Yes.
20   Q    And then it also talks about the fact that, it says
21        "Based on Ms. Poston's current disability, Ms. Poston
22        requested an accommodation of being notified one week
23        in advance of meetings before or after school to
24        allow her ample time to secure necessary
25        transportation."  And is that -- was that
```

NICOLE M. POSTON - 10/26/2017

1       accommodation provided?

2   A   Yes.

3   Q   Okay.  And is the accommodation of you being notified

4       in advance of meetings before or after school to

5       allow you ample time to secure necessary

6       transportation still being provided?

7   A   Clarification, for what purpose specifically?  Are

8       you speaking of parent-teacher conferences and large

9       staff meetings?

10  Q   When this was drafted, what was your understanding of

11      what type of meetings this was supposed to apply to,

12      this accommodation was supposed to apply to?

13  A   It was my understanding it was supposed to apply to

14      parent-teacher conferences and staff meetings.

15  Q   Is it your belief that it was not supposed to apply

16      to IEP meetings?

17  A   Correct.

18  Q   Was that something that was specifically discussed

19      with the administration?

20  A   No, because it wasn't an issue.  IEP meetings were

21      held within the school day.

22  Q   And with respect to parent-teacher conferences, were

23      there instances where you were -- you had to secure

24      necessary transportation to get to the parent-teacher

25      conference?

NICOLE M. POSTON - 10/26/2017

Page 74

```
 1   A    Yes.

 2   Q    And how many times would you say that happened,

 3        between 2014 and to present?

 4   A    Sixteen.

 5   Q    And you were provided with ample advance notice in

 6        order to secure necessary transportation on those 16

 7        occasions?

 8   A    Yes, parent-teacher conferences are placed on the

 9        district calendar at the beginning of the year.

10   Q    And what about staff meetings, were there instances

11        where you needed to secure necessary transportation

12        in order to attend a staff meeting, either before or

13        after school?

14   A    On occasion.

15   Q    On occasion.  Were you provided with advance notice

16        of the need for you to attend the staff meeting so

17        that you could secure transportation?

18   A    Yes.

19   Q    And if we look at, maybe it's the next page, it

20        appears that that provision was slightly modified

21        concerning the meetings; is that correct?

22   A    I'm sorry, your question is?  Now that I've read it.

23   Q    You all agreed to slightly modify this provision,

24        correct?

25   A    Correct.
```

NICOLE M. POSTON - 10/26/2017

Page 75

1   Q   And has the district complied with this provision

2       between 2014 to present?

3   A   Yes.

4   Q   Okay.  And sorry, I know that we started off with

5       number one, the large screen computer monitor, you

6       stated that the district provided you with this

7       accommodation and you continue to receive that

8       accommodation.  Has the district complied with the

9       provision of a large screen computer between 2014 and

10      present?

11   A   Yes.

12   Q   Okay.  And has the district complied with the

13      provision of ZoomText between 2014 to present?

14   A   Yes.

15   Q   And the provision of IT in-service and in-service

16      involving IT, has the district complied with that

17      provision from 2014 to present?

18   A   I have not had any issues with ZoomText during IT

19      in-services or trainings.

20   Q   Okay.  You specifically reference ZoomText.  Did you

21      have an issue with any computer or similar

22      modifications or IT training or in-services?

23   A   No, I had issues with other accommodations.

24   Q   Okay.  All right.  Well, we're just focusing in on

25      this.  So they complied with this?

NICOLE M. POSTON - 10/26/2017

Page 76

1    A     Yes.

2    Q     And in terms of priority status, the district has

3          complied with this provision, correct?

4    A     Yes.

5    Q     Now, if we move to the bullet on page -- it starts

6          off "Based on Ms. Poston's documented disability and

7          the accommodations provided, the district suggested

8          exploring a reasonable accommodation with providing

9          Ms. Poston with copies of in-service or staff

10         training materials in certain format."  Now, in

11         January of 2014, is that the -- or February of 2014,

12         is this the first time that there was some discussion

13         about 14 font -- point font size in particular?  It

14         says "Ms. Poston explained that she has an easier

15         time reading font that is 14 font size or greater

16         when printed materials are used."

17   A     That was the first time any kind of font size was

18         explored.

19   Q     And when did you first request that you be provided

20         with materials in an 18 font size?

21   A     I don't recall the date.

22   Q     Do you recall the school year?

23   A     It wasn't during the school year.  It was the summer

24         of 2014.

25   Q     So what happened during the summer of 2014?

NICOLE M. POSTON - 10/26/2017

Page 77

 1    A    A discussion took place after a negotiation session

 2         between myself, my attorney and the administration

 3         and the Board attorney.

 4    Q    **And you're saying after this discussion is when you**

 5         **requested that documents be provided in an 18 font**

 6         **size rather than a 14 font size?**

 7    A    Correct.

 8                          - - - -

 9                   (Thereupon, Defendant's Exhibit 4 was

10              marked for identification.)

11                          - - - -

12    Q    **Have you seen what's been marked as Number 4 before?**

13         **It's that one.**

14    A    This?

15    Q    **Um-um.**

16    A    So there's no large print, just so I understand?

17    Q    **That's not the correct -- I'm sorry.**

18    A    Is it part of --

19    Q    **No, that's a different document.  I apologize, I**

20         **thought that this was the correct size.  I enlarged**

21         **everything else.**

22                   MS. WHITE:  Nicole, would you prefer

23              that it be read or --

24    Q    **Yeah, I can read the specific provision that I want**

25         **to ask you about.**

NICOLE M. POSTON - 10/26/2017

Page 78

```
 1    A    That would be helpful.

 2    Q    Okay.  On the last page of the document, it says "You

 3         requested the 14 font size to be increased to 18 font

 4         in printed materials administrators provide to you at

 5         school.  We all acknowledged the difficulties

 6         encountered in implementing the 14 font size

 7         accommodation last year, which was due to a variety

 8         of factors, including original materials coming in

 9         varied font sizes and difficulty in achieving

10         uniformity with 14 font size in copying those

11         materials; practical issues in copying materials,

12         e.g. enlarging versus increasing percentage to be

13         copied and unintentionally cutting off parts of the

14         material.  By providing the laptop with ZoomText

15         software and access to electronic copies of documents

16         via the shared drive or e-mail, we anticipate you

17         will be able to view all materials.  We anticipate

18         this should better address the situation and result

19         in minimal need for printed materials.  For those few

20         occasions, the district has provided you with 11 by

21         17 paper and use of the copier to make printed copies

22         you need."  Do you remember that provision of this

23         document entitled Reasonable Accommodations for

24         2014-2015 School Year?

25    A    Yes.
```

Page 79

```
 1   Q    Okay.  And did the district move forward with making

 2        sure you had a laptop with ZoomText software and

 3        access to electronic copies of documents via the

 4        shared drive or e-mail during the 2014-2015 school

 5        year?

 6   A    They made sure that I had a laptop with ZoomText.

 7   Q    Okay.  And were you able to review documents that

 8        were provided by administrators during trainings and

 9        meetings by using the laptop with ZoomText software?

10   A    No.  The issue that was created as a result of that,

11        which I raised with administration, is that due to

12        Zoom -- the way ZoomText works, it's difficult to

13        view more than one document on the computer at a

14        time.

15   Q    And you understand that the -- an employer has an

16        obligation to provide a reasonable accommodation,

17        correct?

18   A    Yes.

19   Q    Okay.  And here they suggest that it was very

20        difficult to increase the font size without losing

21        some of the information in the materials that were

22        being provided.  Did you have any reason to dispute

23        that it was difficult for them to always increase

24        documents from a 14 -- from a smaller font size to 14

25        point font size?
```

Page 80

```
 1   A    Can you rephrase?
 2   Q    Did you have any reason to dispute the district's
 3        claim that it experienced difficulties when
 4        implementing the 14 font size at times with respect
 5        to documents that were being provided to you?
 6   A    Yeah, I had reason to dispute that they were stating
 7        that it was not possible.
 8   Q    They didn't say it was impossible all the time, did
 9        they?
10   A    They said it was not possible for a significant
11        amount of time.
12   Q    And why did you dispute that?
13   A    Because it is possible, and it had been provided in
14        the past, so --
15   Q    But you said that there were times where it wasn't
16        provided to you in the past --
17   A    Rarely.
18   Q    -- between 2002 and 2013.
19   A    It was rare that it was not provided.  In those cases
20        it wasn't because they couldn't, it was more a matter
21        of they just forgot.
22   Q    And you don't believe it was reasonable for them to
23        suggest an alternative method of making sure you had
24        the materials you needed through the ZoomText
25        software and the laptop so that you could participate
```

NICOLE M. POSTON - 10/26/2017

1       **in training?**

2   A   It wasn't reasonable because it wasn't effective.

3   **Q   And how was it not effective?**

4   A   Because I couldn't access the documents that I

5       needed.

6   **Q   Now, you were able to access other documents using**

7       **ZoomText software, correct?**

8   A   A single document at a time.

9   **Q   Did you suggest any other alternatives to them, other**

10      **than the 14 or 18 font size, when it came to**

11      **materials being provided to you during in-services or**

12      **trainings?**

13  A   Not specifically, no.

14  **Q   "Not specifically," is that -- I don't understand.**

15  A   Well, I told them that it was acceptable to provide a

16      PowerPoint presentation, for example, to be accessed

17      on my computer while I accessed all other documents

18      in hard copy format, accessible large print format.

19  **Q   And did the district make sure that you had access to**

20      **the PowerPoints via computer?**

21  A   Occasionally.

22  **Q   Occasionally.  What percentage of the time would you**

23      **say that they provided it to you, access via**

24      **PowerPoint?**

25  A   Are we speaking of January 2014 to present?

NICOLE M. POSTON - 10/26/2017

Page 82

1  Q  January 2014 to present, yes.

2  A  Twenty percent.

3  Q  So 20 percent of the time they provided you with

4     access to PowerPoints via computer; is that correct?

5  A  Yeah.

6  Q  And the other 80 percent of the time what happened?

7  A  It was not provided.

8  Q  Was it provided at some point after the training?

9  A  Most occasions.

10 Q  And when it was provided to you after the trainings,

11    were you able to -- were you provided with the

12    opportunity for additional training or the

13    opportunity to speak with individuals about the

14    PowerPoint?

15 A  About 50 percent of the time.

16 Q  And who offered you those opportunities?

17 A  Administration.

18 Q  Anyone in particular in administration, or did you

19    deal with different individuals?

20 A  More often it was Mr. Fortner, Mark Fortner, but

21    occasionally there were other administrators.

22 Q  And did you ever take the school district up on its

23    offer to provide you with additional training or to

24    ask questions concerning the PowerPoints that were

25    provided to you after the training?  And again, this

Page 83

```
 1         is between 2014 to present.
 2    A    No, I don't remember.
 3    Q    You don't remember?
 4    A    I don't remember a time when I did.
 5    Q    Okay.  And in this paragraph it also mentioned that
 6         the district has provided you with 11 by 17 paper and
 7         the use of a copier to make printed copies as you
 8         need it.  Has that accommodation been provided
 9         between 2014 and present?
10    A    It was provided from this date forward.
11    Q    From this date forward, okay.  So from October of
12         2014 to present this accommodation has been provided?
13    A    Correct.
14                        - - - -
15                   (Thereupon, Defendant's Exhibit 5 was
16                 marked for identification.)
17                        - - - -
18    Q    If you could take a moment to look at that and let me
19         know once you've had an opportunity to do that.
20    A    Okay.  I've read it.
21    Q    And this document is dated October 20, 2015.  Do you
22         recall meeting with the administration to discuss
23         seven complaints that you had filed related to
24         documents being provided in an inaccessible format,
25         or are you saying that they were provided in an
```

NICOLE M. POSTON - 10/26/2017

Page 84

1      inaccessible format?

2    A   Yes, I remember the meeting.

3    Q   Okay.  Now, with respect to the August 18, 2015 IEP

4        checklist that was handed out in 14 font size, did

5        you speak with anyone in the administration before

6        you filed your complaint?

7              MS. WHITE:  I'm going to object to form.

8              I don't think there is any evidence that it

9              was in 14 point font size.

10   Q   Did you speak with your lawyer before you filed your

11       complaint to see if you could get the documents in an

12       accessible format?

13   A   I'm not sure I understand the question.  Can you

14       rephrase?

15   Q   Sure.  So there was a special ed. meeting with Elaine

16       Karp, and there were materials that were handed out,

17       an IEP checklist, correct?

18   A   Correct.

19   Q   Okay.  And you claimed that the document was not

20       provided in an accessible format, correct?

21   A   Correct.

22   Q   Did you speak with either Ms. Karp or any

23       administrator about receiving that checklist in an

24       accessible format before you filed a complaint?

25   A   I believe that there was a conversation that occurred

Page 85

1           between the date of this incident and when I filed

2           the complaint.

3     Q     So it looks like the incident happened on August 18,

4           2015, and you filed a complaint on September 6, 2015.

5           Did you have a meeting -- did you ask for someone to

6           provide you with the documents in an accessible

7           format between August 18th and September 6th?

8     A     I just remember that I had a conversation in which I

9           told them that it wasn't an accessible format.

10    Q     And by "an accessible format," it says here large

11          print 18 font size.  Is that what you were talking

12          about?

13    A     Correct.

14    Q     And it says that "Elaine stated that she handed out

15          IEP Checklist in 14 size font," and I know your

16          attorney has already objected as to whether that

17          happened or not, but do you have any reason to

18          dispute that it wasn't in a 14 size font?

19    A     I can't say that it was in a 14 font.

20    Q     And then with respect to number two, in the complaint

21          it states "August 18, 2015:  Building-wide Staff

22          Meeting at MIS/MJHS at 10:00 A.M.  Presentation was

23          not made accessible and handout was not in large

24          print 18 font, but received same as everyone else."

25          Did you speak with someone in between August 18, 2015

NICOLE M. POSTON - 10/26/2017

Page 86

1     and September 6th of 2015 to ask for the materials to

2     be provided to you in an accessible format before

3     filing your complaint?

4  A  I don't recall.

5  Q  And in Exhibit Number 5, point bullet two, it says

6     the Massillon Junior High School administration

7     stated that the handout was in 14 size font.  Do you

8     have any reason to dispute that it wasn't provided in

9     14 size font?

10 A  I can't say that it was in 14 font.

11 Q  Number three, the next complaint, it relates to

12    something that happened on August 19, 2015, it was a

13    PD session by Brian McNulty, you stated that

14    PowerPoint presentation not accessible, handout was

15    not in large print, administration has been asked

16    repeatedly to provide documents at PD sessions in

17    accessible large print format.  Did you speak with

18    anyone between August 19, 2015 and September 6th to

19    ask that the documents be provided in an accessible

20    format before filing your complaint?

21 A  I don't recall.

22 Q  Okay.  And it states in there that MJHS

23    administration stated that handout was in 14 size

24    font.  Do you have any reason to dispute that it was

25    not provided in a 14 size front?

NICOLE M. POSTON - 10/26/2017

Page 87

```
 1   A    I can't say that it was in 14 font.

 2   Q    Number four relates to August 19, 2015 and PD session

 3        by SST9.  Do you recall that particular complaint?

 4   A    Yes.

 5   Q    Okay.  And did you speak with anyone in

 6        administration between August 19, 2015 and

 7        September 6, 2015 and ask them to provide you with

 8        documents in an accessible format before filing your

 9        complaint?

10   A    I can't say that I did or didn't.

11   Q    And again, it says the "MJHS administration stated

12        that building data handout was in 14 size font."  Do

13        you have any reason to dispute that it was provided

14        in 14 size font?

15   A    I can't say that it was provided in 14 font.

16   Q    And number five, there was a PD session educating for

17        all presented by Kris Blair, you said that "No

18        presentation materials were provided in accessible

19        format, large print 18 font.  Administration has been

20        repeatedly asked to provide PD materials in an

21        accessible large print format."  Same question, did

22        you speak with anyone between August 19, 2015 and

23        September 6, 2015 to ask them to provide you with the

24        documents in an accessible format before filing your

25        complaint?
```

Page 88

```
 1   A    I can't say that I did or didn't.

 2   Q    You can't say that you did or didn't?

 3   A    Correct.

 4   Q    Meaning you don't recall?

 5   A    I don't recall.

 6   Q    Okay.  And it states here that "Blair stated that

 7        there were no handouts."  Do you have any reason to

 8        dispute that there were no handouts even provided

 9        during that PD session?

10   A    I can't say.

11   Q    Okay.  And number six, August 20, 2015, it talks

12        about forms to be filled out were put in mailbox,

13        they were contact information, medical emergency and

14        sunshine committee forms, were the same forms

15        everyone else received and were not in accessible

16        format, large print.  Administration was told only

17        forms mailed home could be regular size for print.

18        When you asked for an accommodation in terms of

19        printed materials being provided in an accessible

20        format, was it primarily related to meetings and

21        professional development and in-service trainings?

22   A    Primarily.

23   Q    Okay.  So the fact that contact information, medical

24        emergency and sunshine committee forms weren't

25        provided in large font, is that -- do you believe
```

NICOLE M. POSTON - 10/26/2017

Page 89

```
 1        that that's covered by the accommodation plan?

 2   A    Yes.

 3   Q    Was that discussed?

 4   A    Yes.

 5   Q    And who did you discuss the fact that these type of

 6        documents would be provided in an accessible format

 7        with?

 8   A    Mr. Fortner.

 9   Q    But is it correct that forms that are mailed home do

10        not have to be in an increased size font?

11   A    Yes.

12   Q    And in between August 20th of 2015 and September 6,

13        2015, did you ask for someone to provide these

14        documents to you in an accessible format?

15   A    I don't recall.

16   Q    And then lastly, August 31st, the Staff Education

17        Technology Acceptable Use and Safety Agreement you

18        stated was put in your mailbox in regular size font,

19        not large 18 font, it was in the same format as all

20        other staff received.  Did you speak with anyone

21        between August 31st and September 6th about the need

22        for this documentation before filing your complaint?

23   A    Not -- I don't recall.

24                          - - - -

25                          (Thereupon, Defendant's Exhibit 6 was
```

NICOLE M. POSTON - 10/26/2017

Page 90

```
 1                    marked for identification.)

 2                         - - - -

 3    Q    If you could take a moment to take a look at what's

 4         been marked as Exhibit 6.  I'm sorry, I'm going to

 5         give you the Bates stamped one.

 6                    MS. WHITE:  Are you able to review?

 7                    THE WITNESS:  It's slightly smaller than

 8         like what this is, so I don't know, I'll try.

 9    Q    It's a different font, so that may be, but I blew it

10         up as large as possible.

11    A    I have a general idea of what this is.

12    Q    This was a document provided to you and your counsel,

13         Kathleen McKinley, from Nicole Donovsky, who was

14         designated as the compliance officer for the

15         Massillon City School District related to the seven

16         complaints we just discussed, and it's dated

17         December 14, 2015.  Did you have an opportunity to

18         meet with the administration in relation to your

19         complaints before this document was issued in

20         December of 2015?

21    A    Are you speaking of the seven complaints?

22    Q    Yes; yes, the seven complaints.

23    A    Yes, we met on the -- it's identified somewhere.

24    Q    So you met on the 20th?

25    A    Yeah, the 20th.
```

Page 91

| | | |
|---|---|---|
| 1 | Q | And was Ms. Donovsky present during that meeting? |
| 2 | A | No. |
| 3 | Q | Did you at some point -- |
| 4 | A | It was Mr. Compton, Fred Compton. |
| 5 | Q | Oh, Fred Compton, okay, not Rick Ross? |
| 6 | A | Nope, Fred Compton. |
| 7 | Q | And was Fred Compton reviewing the complaint on |
| 8 | | behalf of the district, do you know? |
| 9 | A | Yeah, he was representing the district at that moment |
| 10 | | in time, he had replaced Sarah Moore. |
| 11 | Q | Now, in the conclusion, Ms. Donovsky states in "Some |
| 12 | | instances where accommodations were not provided may |
| 13 | | be attributed to a lack of understanding of the |
| 14 | | accommodation by the person/people responsible for |
| 15 | | providing the documentation, lack of communication or |
| 16 | | lack of time or control."  Did you have any reason to |
| 17 | | dispute that those may have been some of the things |
| 18 | | that led to documents not being provided in an |
| 19 | | accessible format? |
| 20 | A | I dispute it on some level, yes. |
| 21 | Q | And what did you dispute?  What is it that you |
| 22 | | disputed? |
| 23 | A | That there was lack of understanding for what was |
| 24 | | expected in terms of the accommodations. |
| 25 | Q | You don't think that there was a lack of |

NICOLE M. POSTON - 10/26/2017

1       understanding with respect to whether it should be 14

2       size font or 18 size font?

3    A  No, I don't think there should have been lack of

4       understanding in regards to that.

5    Q  But earlier that year the district noted that it was

6       very difficult to provide documents in 14 size font

7       and would be even more difficult to provide documents

8       in 18 size font.

9    A  And I disputed that as well, that it was more

10      difficult.

11   Q  Ms. Donovsky also states "I will note that Ms. Poston

12      did not request assistance or take any immediate

13      action to notify administration of the failure to

14      accommodate her until she filed her complaints."  Any

15      reason to dispute that conclusion reached by

16      Ms. Donovsky?

17   A  Well, yes, because she's also discussing complaint

18      number 13 as well in this disposition, and at that

19      point there had been numerous discussions that had

20      occurred as a result of the initial seven complaints,

21      so --

22   Q  So if you take complaint 13 out, then it is true that

23      you didn't request assistance or take any --

24   A  I can't say whether I did or didn't.

25   Q  Okay.  Wouldn't you agree that if you did immediately

NICOLE M. POSTON - 10/26/2017

Page 93

1       notify the administration of the fact that the

2       documents weren't provided in an accessible format,

3       that they could have tried to quickly resolve the

4       issue?

5   A   I dispute that.

6   Q   You dispute that why?

7   A   Because in most of the cases in which they were

8       meetings or in-services, they were not in a position

9       to be able to immediately address the issue.

10  Q   But if you would have notified them afterwards, you

11      don't -- wouldn't they have attempted to try and get

12      the documents to you in an accessible format?

13  A   That was after the fact.

14  Q   But isn't the point to make sure that you are able to

15      have the documents in an accessible format at some

16      point, even if they're not provided during the actual

17      in-service or training?

18  A   Eventually, yes.  And by October they were well aware

19      of it, if not before.

20                      - - - -

21              (Thereupon, Defendant's Exhibit 7 was

22          marked for identification.)

23                      - - - -

24  Q   This is 7.  Take a moment to look at that.

25          I've handed you what's been marked as Exhibit 7,

Page 94

1          which is an accommodation plan dated January 18,

2          2017.  And if I could have you take a look at under

3          Training/Accommodations, number one, and it states

4          "Ms. Poston will notify the assistant superintendent

5          or designee within 24 hours of in-service/trainings

6          that the accommodations contained herein were not

7          provided.  The assistant superintendent or designee

8          will arrange follow-up provisions to provide any

9          required information from meetings, in-services or

10         trainings not provided at that time."  Did you -- and

11         you agreed to this provision, correct?

12    A    Correct.

13    Q    Okay.  And what is your understanding of this

14         particular paragraph one under

15         Training/Accommodations?

16    A    That if an accommodation isn't provided, that I'm to

17         notify Mr. Fortner.

18    Q    And as an educator, you would agree that educators

19         are required to review several documents on a daily

20         basis, correct?

21    A    I guess, yeah.

22    Q    Okay.  And as an educator, you attend quite a few

23         meetings throughout the year; is that correct?

24    A    Yes.

25    Q    Okay.  And you also attend training and professional

Page 95

1          development frequently throughout the year, correct?

2    A     Yes.

3    Q     Now, you would agree that this paragraph is intended

4          to deal with instances where the district

5          inadvertently or mistakenly neglects to give you

6          documents in an accessible format during training or

7          professional development, correct?

8    A     Yes.

9    Q     Okay.  And you would also agree that it's designed to

10         ensure that you notify the district as soon as

11         possible concerning the fact that you were not

12         provided an accessible format, correct?

13   A     Correct.

14   Q     And isn't this provision also designed to ensure that

15         once you notify the district, it will provide you or

16         ensure that you're provided with a document, correct?

17   A     That's the intent.

18   Q     Now, when you have notified Mr. Fortner that you

19         didn't receive materials during professional

20         development or training, he asked you if you needed

21         the documents in an accessible format, correct?

22   A     On most --

23                   MS. WHITE:  Can I object here?  Can we

24              clarify what time period we're talking about?

25              We're talking about an accommodation plan

Page 96

1            signed in January 2017, but we were also just

2            discussing events that happened two years

3            previous.

4                    MS. MASSEY:  Yes.

5                    MS. WHITE:  Okay.

6                    MS. MASSEY:  So I'm asking questions

7            about -- it can only apply to 2017, because

8            that's when this provision was signed.  So we

9            can clarify for the record I'm asking about

10           after this agreement was signed.

11   Q    And the only reason why I'm asking, there are times

12        in your responses to interrogatories that you

13        reference dates in 2017 that you weren't provided

14        with documents.

15   A    Correct.

16   Q    Okay.  So back to my question.  When you notified --

17        I don't know if it was answered or not, but when you

18        notified Mr. Fortner that you didn't receive

19        materials during professional development or

20        training, he asked you if you needed the documents in

21        an accessible format; is that correct?

22   A    Yes.

23   Q    Okay.  And in those instances where you advised

24        Mr. Fortner that you did need the documents, he asked

25        you if you needed any training or any other meetings

Page 97

1          in addition to the document, correct?

2   A   On most occasions.

3   Q   And would you agree that the district wants to make

4          sure that if you're not provided with a document

5          during training or professional development, that you

6          still have the opportunity to benefit from the

7          information contained in the document through

8          additional training, correct?

9   A   Can you rephrase?

10  Q   You would agree that the district wants to make sure

11         that if you're not provided with a document during

12         training or professional development, that you still

13         have the opportunity to benefit from the information

14         contained in the document through additional

15         training, if necessary, correct?

16  A   I think that's their intent, but I would dispute it.

17  Q   Okay.  And why would you dispute it?

18  A   Because there are times in which if the documents are

19         provided after the fact, that the benefit cannot be

20         gained from them when they are provided after the

21         fact.

22  Q   So just by analogy, if a student misses school and

23         documents are provided to him or her after their

24         absence, they can't -- wouldn't they be able to still

25         benefit from the document and the information if they

NICOLE M. POSTON - 10/26/2017

Page 98

1     get some additional assistance with respect to the

2     document?

3  A  Not if the instruction was structured in a way in

4     which conversations and interactions occurred within

5     the classroom that they needed in order to understand

6     the materials that were provided to them at a later

7     time.

8  Q  But you're actually present for those conversations

9     that are happening during the trainings where these

10    materials are being provided, correct?  So even

11    though you don't have the document, you're still

12    hearing the conversation and understand what the

13    individuals are talking about, correct?

14 A  But the connection can't be made, because if you

15    don't have the document with you, the connection

16    can't be made by what is actually being stated.

17 Q  Okay.  So give me an instance where a document wasn't

18    handed out to you during a presentation and it was

19    provided to you afterwards along with an offered

20    training, and you determined that it was not going to

21    be beneficial to have any additional training or

22    meeting regarding the document.

23 A  There was -- I'm trying to think of the best example,

24    because there were several.

25         There was a training recently on youth mental

Page 99

```
 1              health, and a document was given in regular font and
 2              which all participants individually were to complete
 3              the document, and then that document was then used to
 4              have discussions and both in groups and then as an
 5              entire group, so small groups and then large group,
 6              and further information was provided as a result of
 7              the information that the individuals had put on that
 8              form, and there was, like, connections made between
 9              what was being discussed in the groups, both in small
10              group and in large group, in relation to what
11              individuals had put on their forms.
12       Q      So it's your testimony you were not able to follow
13              along at all during those discussions in the small
14              and larger groups?
15       A      Correct.
16       Q      And it's your testimony that after being provided
17              with the document in an accessible format and having
18              the opportunity to meet with the individual who
19              presented that paperwork, you still wouldn't have
20              benefited from having that document and having a
21              discussion with that individual?
22       A      Correct.
23       Q      That's your determination, though, correct?
24       A      Yes.
25       Q      Do you believe it's a reasonable accommodation for
```

Page 100

```
 1          them to try to offer you those materials after, if

 2          they haven't been provided to you during the

 3          professional development or training?

 4    A     No.

 5    Q     So you're saying there is no instance in which having

 6          a document following a training is going to benefit

 7          you in any way?

 8    A     There are occasions where it could benefit me.

 9    Q     Okay.  And there are occasions where being able to

10          have additional training or a meeting related to the

11          document will be able to benefit you, correct?

12    A     It would be better than nothing at all.

13    Q     So that's yes?

14    A     It doesn't measure to the reasonable accommodation of

15          being provided the documents at the actual training.

16                    MS. MASSEY:  If we can take a quick

17                 break, and then I'm not going to be much

18                 longer after this.

19                          - - - -

20                 (Thereupon, a recess was had.)

21                          - - - -

22    Q     Now, in interrogatory number eight, we asked you to

23          identify the persons who failed to take reasonable

24          steps to ensure that effective accommodations are

25          provided to Plaintiff as alleged in paragraphs 92,
```

NICOLE M. POSTON - 10/26/2017

Page 101

```
 1        105, 115, between January 2014 through present.  In
 2        addition to listing the names of 18 employees, you
 3        listed the names of the following Board members, Liz
 4        Hersher, John Paquelet -- do you know if that's how
 5        you pronounce his name?
 6   A    I believe it's appropriate.
 7   Q    -- Ron Pribich or Pribich, Tom Radel, and Mary
 8        Strukel.  How did the Board fail to take reasonable
 9        steps to ensure that you had effective -- that
10        effective accommodations were provided to you?
11   A    I appealed my complaints to the Board of Education,
12        and held -- had a meeting with them in executive
13        session and asked that they address my concerns with
14        regards to accommodations not being provided.
15   Q    And you had the opportunity to address them in
16        executive session during a meeting?
17   A    Yes.
18   Q    And after that, was an accommodation plan developed,
19        or a revised accommodation plan developed as a result
20        following your meeting with the Board?
21   A    There was an accommodation meeting that happened
22        after the Board meeting.  Whether there was a
23        connection between the two, I don't know.
24   Q    And what, if any, has been the Board of Education's
25        direct involvement in the alleged discrimination
```

Page 102

1            against you on the basis of your disability?

2                                - - - -

3                     (Thereupon, an interruption was had.)

4                                - - - -

5    A   Can you repeat the question, please?

6    Q   Yes.  What, if any, has been the Board of Education's

7        direct involvement in the alleged discrimination

8        against you on the basis of your disability?

9    A   There wasn't direct discrimination by the Board.

10   Q   And earlier I asked you questions about instances

11       where you were not provided with documents during

12       professional development or training.  Now, the

13       failure -- the fact that you didn't receive those

14       documents during the professional development or

15       training did not impact your ability to perform the

16       essential functions of your position, correct?

17   A   I can't say that they didn't impact my ability to do

18       the essential functions of my job.

19   Q   You can't say that they didn't impact your ability to

20       perform the essential functions of your job, is that

21       what you said?

22   A   Correct.

23   Q   You stated that you have received good evaluations,

24       accomplished, correct?

25   A   I did receive a good evaluation of accomplished.

NICOLE M. POSTON - 10/26/2017

1   Q   Okay.  Are you able to still effectively perform your

2       duties and provide services to students even when you

3       don't get documents in an accessible format during

4       professional development and training?

5   A   I don't always have the information or training to

6       provide services in the manner in which the

7       administration would like me to provide the

8       instruction and services to students.

9   Q   Has an administrator told you that you've been unable

10      to provide services in the manner that they would

11      like to students because you didn't get a document

12      during professional development or in-service

13      training?

14  A   I don't recall a specific conversation --

15  Q   Has an administrator -- sorry.

16  A   -- that an administrator has stated that directly.

17  Q   Has an administrator, between 2014 and 2017, ever

18      stated that you didn't effectively perform your

19      duties?

20  A   Not that I recall.

21  Q   Now, in response to the request for production of

22      documents, you provided us with some -- your attorney

23      provided us with some medical documentation, and

24      related to just some of the medical issues that

25      you've experienced allegedly since -- between 2014

1      and now.  Did you have a previous history of stress

2      before 2014?

3    A    No.

4    Q    Previous anxiety before 2014?

5    A    No.

6    Q    Lack of sleep before 2014?

7    A    On occasion.

8    Q    Stomach problems before 2014?

9    A    No.

10    Q    And depression before 2014?

11    A    No.

12    Q    And in response to interrogatory number 17, you

13        stated that you've received treatment from Doctor

14        David Gannon and Doctor Richard Lehrer and Doctor

15        Patrick McFeely.  And it says Doctor David Gannon,

16        individual psychotherapy for stress and anxiety.  Did

17        you see Doctor David Gannon before 2014?

18    A    No.

19    Q    When was the first time you saw Doctor David Gannon?

20    A    November of 2016.

21    Q    And you also stated that you saw Doctor Patrick

22        McFeely, and the diagnosis was fibromyalgia.  When

23        were you first diagnosed with fibromyalgia?

24    A    I don't recall the year that I was diagnosed, but

25        it's been quite a few years.

NICOLE M. POSTON - 10/26/2017

Page 105

| 1 | Q | Was it before 2014? |
|---|---|---|

2   A   Oh, yeah, way before.

**3   Q   And it says that you were treated for illness, acid**

**4       reflux, stress and anxiety; is that correct?**

5   A   Yeah.

**6   Q   And that's related to your fibromyalgia, correct?**

7   A   No, not all of those are related to my fibromyalgia.

**8   Q   It says "illness."  Is that related to your**

**9       fibromyalgia?**

10   A   It's interrelated, yes.

**11   Q   Acid reflux, is that related to your fibromyalgia?**

12   A   No.

**13   Q   So do you see Doctor Patrick McFeely for just acid**

**14       reflux?**

15   A   It's stress induced.

**16   Q   Is the stress and anxiety related to your**

**17       fibromyalgia, is that a part of the diagnosis?**

18   A   Stress is a trigger of fibromyalgia.

**19   Q   Which you've had, like you said, for some time,**

**20       correct?**

21   A   Yes, the diagnosis I've had.

**22   Q   Okay.  And how often would you say you've seen Doctor**

**23       McFeely between January of 2014 and December of 2016**

**24       for your fibromyalgia?**

25   A   Biweekly.

NICOLE M. POSTON - 10/26/2017

| 1 | Q | Did you see him biweekly before January 2014? |
|---|---|---|
| 2 | A | Not consistently. |
| 3 | Q | There were times you saw him biweekly before January |
| 4 | | of 2014? |
| 5 | A | There might have been an occasion where I saw him |
| 6 | | biweekly, but it was dependent upon the symptoms. |
| 7 | Q | Okay.  On average, how often do you say you would |
| 8 | | have seen him before 2014? |
| 9 | A | Once a month. |
| 10 | Q | And then also you've seen Doctor Richard Lehrer for |
| 11 | | dry eyes.  Did that exist before January 2014, the |
| 12 | | dry eyes? |
| 13 | A | No. |
| 14 | Q | And how often have you seen Doctor Lehrer for dry |
| 15 | | eyes since January 2014? |
| 16 | A | I can't say.  I don't know. |
| 17 | Q | Did you see any physician for dry eyes before |
| 18 | | January 2014? |
| 19 | A | I don't recall seeing anybody for dry eyes. |
| 20 | Q | Are you still treating with Doctor David Gannon? |
| 21 | A | Yes. |
| 22 | Q | Are you still treating with Doctor Patrick McFeely? |
| 23 | A | Yes. |
| 24 | Q | And what about Doctor Richard Lehrer, are you still |
| 25 | | treating with him? |

NICOLE M. POSTON - 10/26/2017

Page 107

```
 1   A    Yes.
 2   Q    And have you been prescribed medication by Doctor
 3        Gannon for the stress and anxiety?
 4   A    No, not directly.
 5   Q    Prior to January of 2014, have you treated with a
 6        psychiatrist at all?
 7   A    Not in the context that you're speaking of.
 8   Q    I'm not speaking in any context.  I'm just asking you
 9        a straight question.  Have you treated --
10   A    At the age of nine I saw a psychotherapist on two
11        occasions for not being able to swallow food
12        properly.  My parents were concerned.  They took me
13        for two sessions with a psychiatrist, who then told
14        them that I was perfectly fine and it would go away
15        on its own, and after those two occasions I never
16        went back.
17   Q    Okay.  What about a psychologist at all?
18   A    No.
19   Q    And did you treat with any doctors for stress and
20        anxiety before January of 2014?
21   A    No.
22   Q    Now, we asked you a question about damages, and it
23        says that you have incurred medical expenses in the
24        amount of $10,886.75.  Aren't you covered by the
25        Board's health insurance?
```

NICOLE M. POSTON - 10/26/2017

Page 108

```
 1   A    I am.
 2   Q    Okay.  Now, is the $10,886.75 out-of-pocket expenses
 3        you've incurred?
 4   A    Correct.
 5   Q    And do you have any reason to know why these costs
 6        were not covered by your health insurance?
 7   A    Some of the treatments are not covered by the
 8        insurance.
 9   Q    Do those treatments include the acupuncture?
10   A    Yes.
11   Q    And massotherapy?
12   A    Yes.
13   Q    Any other types of treatments you are aware of that
14        aren't covered by your health insurance that you've
15        received?  It says diet and medication as well.
16   A    There are portions of like a doctor's visit or, you
17        know, my psychotherapy appointments that are not
18        covered by the insurance that are my responsibility
19        out-of-pocket, they're not fully covered.
20   Q    At this point I don't have any other questions for
21        you, but I will reserve the right if we have any
22        other documents or depending on Mr. Fortner's
23        decision, I'll reserve the right to recall you.
24              MS. WHITE:  I just have a few clarifying
25           questions.
```

NICOLE M. POSTON - 10/26/2017

```
 1                      EXAMINATION OF

 2                      NICOLE M. POSTON

 3        BY MS. WHITE:

 4   Q    If you could pull out Exhibit Number 3, which has

 5        been marked as Defendant's Exhibit Number 3.

 6        Hopefully the accessible version.  It's labeled

 7        February 3, 2014 at the top.

 8   A    Okay.  Found it.

 9   Q    You had previously identified this as the February 3,

10        2014 accommodations plan; is that correct?

11   A    Yes.

12   Q    Okay.  I'd like to direct your attention to the

13        second to last paragraph from the bottom, this is the

14        other side, on the end.

15   A    I'm looking at the front page or end?

16   Q    I'm going to read the section, let me know if I've

17        got this right.  "In the future, should there be a

18        need to review any of these accommodations or

19        potential other accommodations, please contact me to

20        set up another interactive process meeting so we can

21        explore the matter;" is that correct?

22   A    That's correct.

23   Q    So what was your understanding at the end of the

24        February 3, 2014 meeting about how firm this

25        accommodations plan was?
```

NICOLE M. POSTON - 10/26/2017

Page 110

```
 1    A    It was my understanding that it was a document that
 2         could be changed at any time through the interactive
 3         process.
 4    Q    Okay.  And one of the accommodations that was in here
 5         was an accommodation related to font size; is that
 6         right?
 7    A    Correct.
 8    Q    Did that font size of 14 point or greater, was that
 9         an effective accommodation for you?
10    A    No.
11    Q    Did you in fact request an additional interactive
12         process to review that accommodation?
13    A    Yes.
14    Q    Okay.  And what did you request?
15    A    I requested that we hold another interactive meeting
16         to discuss changes that needed to be made to
17         accommodations that I felt were not effective.
18    Q    Was there a specific accommodation that you requested
19         instead of 14 point?
20    A    I requested that materials be provided in at least 18
21         point font or greater.
22    Q    And did the district agree to that request?
23    A    They attempted to provide an alternative
24         accommodation of providing documents just through the
25         computer.
```

NICOLE M. POSTON - 10/26/2017

1  Q  Was that alternative accommodation that the district

2     provided effective for you?

3  A  No.

4  Q  Why was it not effective?

5  A  Because of the computer software, it is not -- I'm

6     not able to view multiple documents on the computer

7     screen at the same time effectively.

8  Q  These meetings where you were hoping to view multiple

9     documents, were other employees at these trainings

10    and in-services reviewing multiple documents at the

11    same time?

12 A  Yes.

13 Q  Was that part of the training experience for those

14    trainings?

15 A  Yes.

16 Q  How often, like what percentage of trainings do you

17    think involved viewing more than one document at

18    once?

19 A  Ninety-five percent.

20 Q  Okay.  If you could bear with me just a second, I'm

21    going to gather some exhibits here.  If you can put

22    that one aside.  If you can get Exhibit 5 again.

23 A  Can you give me some context of --

24 Q  It says meeting date of October 20, 2015.

25 A  Okay.

NICOLE M. POSTON - 10/26/2017

Page 112

```
 1   Q   So we were discussing a number of internal complaints
 2       that you had filed on September 9, 2015; is that
 3       correct?
 4   A   Yes.
 5   Q   And you filed internal complaints on the 9th of
 6       September 2015, but these involved incidents that
 7       occurred on the 18th or 19th or 20th or 31st of
 8       August; is that correct?
 9   A   Yes.
10               MS. MASSEY:  I'm just going to object to
11           the extent it's a leading question.  I'm just
12           going to object for the record.  Thank you.
13   Q   All right.  I believe you testified earlier that --
14       you were asked several times whether you had made any
15       other objection or complaint about lack of
16       accommodations prior to your formal complaint on the
17       9th of September; is that right?
18   A   Correct.
19   Q   I'm going to hand you -- and sorry, and you responded
20       that you couldn't recall?
21   A   Correct.
22               MS. MASSEY:  Objection.  I'm not sure
23           what you're talking about.
24   Q   Okay.  I'm going to hand you what I'm going to mark
25       as Plaintiff's Exhibit Number 1.
```

NICOLE M. POSTON - 10/26/2017

Page 113

1           MS. MASSEY:  Okay.  But you said the

2           question I asked her whether she had filed

3           any other complaints before October, before

4           then?

5           MS. WHITE:  My question was whether she

6           had, she had addressed the lack of

7           accommodations immediately after that meeting

8           prior to the written complaint.

9           MS. MASSEY:  I didn't hear that.

10          MS. WHITE:  Well, let me clarify, then.

11  Q    **Let me just back up a second and mark this as**

12       **Plaintiff's Exhibit Number 1 and ask you to take a**

13       **look and identify it and then we'll go through it.**

14                        - - - -

15          (Thereupon, Plaintiff's Exhibit 1 was

16          marked for identification.)

17                        - - - -

18  Q    **If you could take a look at this and let me know when**

19       **you're ready.**

20          **Do you recognize this document?**

21  A    Yes.

22  Q    **So what is this document?**

23  A    An interaction between myself and Mr. Fortner

24       regarding my request to engage in the interactive

25       process about accommodations, that I had a concern

Page 114

1    that I was not being provided accommodations and so I

2    wanted to engage in that interactive process to

3    address the issues.

4  Q  And what date is Mr. Fortner's letter?

5  A  September 2, 2013 -- or, '15.  I'm sorry, '13.

6  Q  And what date had you contacted Mr. Fortner?  Was it

7    August 26th?  Yeah, was it August 26, 2015?

8  A  I believe, yes.

9  Q  Okay.  And this was concerning a number of trainings

10    at the convocation on the 18th and 19th of 2015; is

11    that right?

12  A  Yes.

13  Q  So you contacted him within seven or eight days of

14    that convocation; is that right?

15  A  Correct.

16  Q  And he contacted you about a week later regarding

17    your request for a meeting; is that right?

18  A  That's correct.

19  Q  And he didn't ask you in this e-mail to file a formal

20    complaint at that time, did he?

21  A  I don't believe so.

22  Q  Okay.  But you did in fact file seven internal

23    complaints on September 9, 2015; is that right?

24  A  Yes.

25  Q  Okay.  Could you tell me a little bit more about the

NICOLE M. POSTON - 10/26/2017

Page 115

1    convocation trainings?  What do they involve?  How

2    are they structured?

3   A  Are you speaking of a particular one, or --

4   Q  Let's talk about August 2015.  What kind of training

5      was this?  Who offered it?  Who was it for?

6   A  After convocation, the SPED meeting with Elaine Karp,

7      is that what you're referring to?

8   Q  That wasn't the only meeting that day; is that right?

9   A  That's correct, that was the first meeting.

10  Q  How many meetings are there at a convocation?

11  A  It varies, depending on which year, but this

12     particular meeting, we had, we had two.

13  Q  And who are the presenters at these trainings; are

14     they internal or external presenters usually?

15  A  Internal most of the time.

16  Q  Do you sometimes have outside trainers as well?

17  A  Occasionally.

18  Q  And what are the general sort of topics that come up

19     at these convocation trainings?

20  A  The trainings that occur at the district level are

21     often related to district data, or in this case with

22     Elaine Karp it was specifically addressing special

23     ed. staff in the district, and information about,

24     important information that had to be shared with

25     special ed. staff for them to know procedures and

NICOLE M. POSTON - 10/26/2017

```
 1            protocols that were necessary to start the year.  At

 2            the building level they're typically information

 3            related to procedures, protocols, expectations for

 4            staff at that building level, and also reviewing

 5            building level data.

 6    Q       Did all small group teachers get the opportunity to

 7            participate in these trainings?

 8    A       Yes.

 9    Q       Were they required to participate in these trainings?

10    A       Yes.

11    Q       Were these trainings useful to your work?

12    A       Yes.

13    Q       Were these trainings essential to your work?

14    A       Yes.

15    Q       Now, we had a number of questions about the items

16            that are on this particular list, Exhibit 5.  I'd

17            like to direct your attention to item number four,

18            which is labeled August 19, 2015:  PD session by

19            SST9.

20    A       Yes.

21    Q       And did you attend that session?

22    A       Yes.

23    Q       What is SST9?

24    A       It stands for State Support Team Number 9, which

25            oversees several counties, I believe.
```

NICOLE M. POSTON - 10/26/2017

Page 117

```
 1   Q    And so correct me if I'm wrong, that's a state entity

 2        that provides training on special education topics to

 3        educators; is that correct?

 4   A    Yes.

 5   Q    Okay.

 6              MS. MASSEY:  Objection.

 7   Q    I'm going to mark this as Plaintiff's Exhibit Number

 8        2.

 9                   - - - -

10             (Thereupon, Plaintiff's Exhibit 2 was

11        marked for identification.)

12                   - - - -

13   Q    I'm going to ask you to take a look at this item that

14        has been marked Plaintiff's Exhibit 2.  Let me know

15        when you've had a chance to sort of look through it.

16            Can you identify the document that is marked

17        Plaintiff's Exhibit 2?

18   A    This was the presentation that was provided at that

19        SST9 training, PD.

20   Q    Did you get a copy of this in advance?

21   A    No.

22   Q    Did you get an electronic copy of this presentation

23        in advance?

24   A    No.

25   Q    Is this a PowerPoint presentation?
```

Page 118

1   A   Yes.

2   Q   Is this the format in which you received this

3       document?

4   A   Yes.

5   Q   And were you able to effectively read and access the

6       information in this document during the training?

7   A   No.

8   Q   Are you able to effectively read this document now?

9   A   No.

10  Q   And are any portions of this document that contain

11      written materials, are any portions of it in size 14

12      font?

13  A   No.

14  Q   Are any portions in 18 font?

15  A   No.

16  Q   And going back to Exhibit 5, you didn't create this

17      document, did you?

18  A   No.

19  Q   And do you agree with the statement MJHS admin stated

20      that -- sorry, stated that building data handout was

21      in 14 size font?

22  A   No.

23  Q   All right.  All right.  I'm going to hand you what

24      Plaintiff's Exhibit 3.

25                          - - - -

NICOLE M. POSTON - 10/26/2017

```
 1                      (Thereupon, Plaintiff's Exhibit 3 was

 2                 marked for identification.)

 3                      - - - -

 4   Q   Can you identify this document?

 5   A   Yes, this is the PBIS handbook for the 2015-16 school

 6       year.

 7   Q   When, if you recall, and how did you receive this

 8       document?

 9   A   It was provided at the staff meeting that occurred at

10       the building level.

11   Q   Is this a true and accurate copy of the materials

12       that you received as you received them at that

13       meeting?

14   A   Yes.

15   Q   And are you able to effectively read all of the

16       material in this handbook?

17   A   No.

18   Q   And you were present at that meeting, though; is that

19       right?

20   A   Yes.

21   Q   And could you tell me your understanding of what kind

22       of information is in the school handbook?

23   A   This handbook involves the information about all the

24       PBIS information that teachers need to know,

25       including expectations of students, teachers,
```

NICOLE M. POSTON - 10/26/2017

Page 120

```
 1          resources for teachers, protocol, the behavior charts
 2          that are being used to -- in different places within
 3          the building to address student behavior.
 4   Q      Was this handbook discussed during the meeting?
 5   A      Yes.
 6   Q      Who were the presenters at that particular meeting
 7          where this was discussed?
 8   A      The principals.
 9   Q      Was your principal one of the presenters?
10   A      Yes.
11   Q      Were these presenters aware of your accommodations
12          plan?
13   A      Yes.
14   Q      And were you provided this material in advance?
15   A      No.
16   Q      And were you provided it in an accessible format?
17   A      Nope.
18   Q      So earlier on you testified that your eyes can become
19          fatigued and strained; is that correct?
20   A      Yes.
21   Q      Does the level of fatigue vary depending on how much
22          reading you do in a day?
23   A      Yes.
24   Q      Can you explain how it varies?
25   A      Well, the more reading I have to do, the greater the
```

NICOLE M. POSTON - 10/26/2017

Page 121

1      eye strain, and also if things are not accessible to

2      me, then it creates greater eye strain for trying to

3      read materials that are not accessible to me.

4   Q   No further questions.

5              MS. MASSEY:  I just have a couple of

6          follow-up questions.

7                    - - - -

8                EXAMINATION OF

9               NICOLE M. POSTON

10     BY MS. MASSEY:

11  Q   With respect to Plaintiff's Exhibit Number 2, and I'm

12      correct it contains a PowerPoint presentation and

13      other materials; is that correct?

14  A   Yes.

15  Q   Okay.  Did you ask for a copy of the presentation and

16      the related documents in an accessible format

17      following this training?

18  A   I addressed the concern with Mr. Fortner in the

19      follow-up e-mail that I sent him after that training.

20  Q   Did you -- that's not my --

21  A   Please rephrase, then.

22  Q   I just asked a very simple question.  Did you ask for

23      a copy of this document in an accessible format

24      following the training?

25  A   I don't recall.

NICOLE M. POSTON - 10/26/2017

Page 122

1    Q    Okay.  And with respect to Plaintiff's Exhibit Number

2         3, did you ask the administration for a copy of the

3         PBIS handbook in an accessible format after it was

4         handed out at the training?

5    A    I did not, because I believe it was provided to us

6         electronically after the meeting.

7    Q    Okay.  But you didn't ask for it to be provided to

8         you in an accessible format afterwards, correct?

9    A    Correct.

10   Q    And with respect to Exhibit Number 1, you sent an

11        e-mail to Mr. Fortner asking if you all could

12        schedule a meeting to review your accommodations,

13        correct?

14   A    Yes, I asked for --

15   Q    All right.

16   A    -- an accommodation meeting.

17   Q    Okay.  But you did not specifically ask him to

18        provide you with the documents in an accessible

19        format in this e-mail, correct?

20   A    No, I did not ask him in that e-mail to ask for the

21        documents.

22   Q    And just another question.  You testified that -- and

23        I don't want to get this wrong, but I think you said

24        that 95 percent of the training you attended involved

25        viewing more than one document at once, do you recall

NICOLE M. POSTON - 10/26/2017

Page 123

1           testifying to that?

2    A      Yes.

3    Q      If I got it wrong, please forgive me.  During what

4           time frame are we talking about?

5    A      January 2014 to present.

6    Q      When you mean that you're required to view one or

7           more documents at once, what does that entail?

8    A      It could mean that I am viewing a PowerPoint

9           presentation and also looking at a handout.  It could

10          mean I'm looking at data in multiple graphs or charts

11          on multiple pages and comparing data.  There's a

12          variety of ways.

13   Q      Before January of 2014, were you required to view

14          more than one document at once during training?

15   A      Yes.

16   Q      What percentage of time between -- before 2014 were

17          you required to review more than one document at

18          once?

19   A      Seventy-five percent.

20   Q      And in each of those instances before January of

21          2014, were documents provided to you in an accessible

22          format?

23   A      Yeah, yes.

24   Q      In hard copy?

25   A      Yes.

NICOLE M. POSTON - 10/26/2017

Page 124

```
 1   Q    Did you view any of the documents on a computer

 2        screen before January 2014?

 3   A    Not often.

 4   Q    I don't have any additional questions.

 5              MS. WHITE:  None here.

 6   Q    As I said before, I'll reserve the right to recall

 7        you as a witness.

 8            Your attorney will instruct you on whether

 9        you're going to read the transcript or not.

10              MS. WHITE:  We'd like to read.

11                    - - - -

12              (Thereupon, the deposition was adjourned

13           at 4:10 P.M.)

14                    - - - -

15

16

17

18

19

20

21

22

23

24

25
```

NICOLE M. POSTON - 10/26/2017

1    The State of Ohio,  )

2    County of Cuyahoga. ) SS:

3                    CERTIFICATE

4       I, Mary Lou Mellinger, a Notary Public within
     and for the State aforesaid, duly commissioned
5    and qualified, do hereby certify that the above-
     named NICOLE M. POSTON was by me, before the
6    giving of her deposition, first duly sworn to
     testify the truth, the whole truth and nothing
7    but the truth;

8       That the deposition as above set forth was
     reduced to writing by me by means of stenotypy,
9    and was later transcribed upon a computer by me;

10      That the said deposition was taken in all
     respects pursuant to the stipulations of counsel
11   herein contained; that the foregoing is the
     deposition given at said time and place by said
12   NICOLE M. POSTON;

13      That I am not a relative or attorney of
     either party or otherwise interested in the
14   event of this action.

15      IN WITNESS WHEREOF, I hereunto set my hand
     and seal of office, at Cleveland, Ohio this
16   30th day of October, A.D. 2017.

17           _Mary Lou Mellinger_

18   _____
     Mary Lou Mellinger, RPR and Notary Public
19   within and for The State of Ohio
     330 Leader Building
20   526 Superior Avenue
     Cleveland, Ohio  44114
21

22   My Commission expires August 9, 2019.

23

24

25

Page 126

2                              ERRATA SHEET

3

4

5    I declare under penalty of perjury that I have read the

6    foregoing _____ pages of my testimony, taken

7    on _____ (date) at

8    _____(city), _____(state),

9

10   and that the same is a true record of the testimony given

11   by me at the time and place herein

12   above set forth, with the following exceptions:

13

14   Page  Line   Should read:                         Reason for Change:

15

16   ___  ___    _____     _____

17               _____     _____

18   ___  ___    _____     _____

19               _____     _____

20   ___  ___    _____     _____

21               _____     _____

22   ___  ___    _____     _____

23               _____     _____

24   ___  ___    _____     _____

25               _____     _____

NICOLE M. POSTON - 10/26/2017

1                           ERRATA SHEET

2      Page  Line   Should read:                    Reason for Change:

3

4      ___  ___     _____          _____

5                   _____          _____

6      ___  ___     _____          _____

7                   _____          _____

8      ___  ___     _____          _____

9                   _____          _____

10     ___  ___     _____          _____

11                  _____          _____

12     ___  ___     _____          _____

13                  _____          _____

14     ___  ___     _____          _____

15                  _____          _____

16     ___  ___     _____          _____

17

18

19     Date: _____

20

21                                    _____

22                                    Signature of Witness

23                                    _____

24                                    Print Name of Witness

25